Ex parte RIGGINS.

(Circuit Court, N. D. Alabama, N. D.   October 24, 1904.)

1. CONSTITUTIONAL LAW—CIVIL RIGHTS.

The first section of Civil Rights Act April 9, 1866, c. 31, 14 Stat. 27, now codified in substance as section 1977 of the Revised Statutes [U. S. Comp. St. 1901, p. 1259], but first passed in the exercise of power claimed by Congress under the thirteenth amendment, prescribes, as the standard of the freedom the amendment gave the emancipated race, perfect equality of civil rights with the white race. The enjoyment of this civil equality with the white race constitutes, in the constitutional sense, the freedom intended to be bestowed, and is a right, privilege, or immunity given or secured by the Constitution and laws of the United States to members of the emancipated race.

2. SAME—INTERFERENCE.

When a·negro citizen is assailed by white men, with the intent to prevent the enjoyment by the negro, because of his race, of any civil right given by law to the white citizen, it is an interference with the negro's enjoyment of equality of civil rights, because of his race, and therefore constitutes an attack upon the right, privilege, or immunity—the freedom —the thirteenth amendment and the acts of Congress secure to him.

3. EQUAL PROTECTION OF THE LAWS.

It is impossible for private persons to prevent, in the constitutional sense, the enjoyment of the right to the equal protection of the laws, since the right is actually enjoyed when a citizen or person is not improperly discriminated against in the making or execution of state laws. The fourteenth amendment in this respect confers only the right to a legal status, which status can be created, in the first instance, only by legislation, and, when conferred, can be impaired only by acts of officials who wield state power in the execution of its laws.

4. SAME—DUE PROCESS OF LAW.

The vital constituents of due process of law, when the state undertakes to punish the citizen for crime, are dependent upon or secured by the Constitution of the United States, by the very force of the words "due process of law," which had a well defined and settled meaning when they were inserted in the fourteenth amendment; and the right, privilege, or immunity to have the state afford these things to the citizen, when taken in custody to punish him for crime, is secured by or dependent upon the Constitution of the United States.

5. SAME.

When the state takes a person or citizen into custody for trial on accusation of crime against its laws, the Constitution of the United States compels the state to afford him the enjoyment of many rights, among .them, in this state, the protection of the prisoner while in confinement awaiting trial, the bringing of the prisoner into court, the assembling of a jury, the hearing of the witnesses and prisoner's counsel, the charge of the judge, the seclusion of the jury from outside interference, the return by the jury of a verdict in the presence of the prisoner, the passing of judgment upon him according to the verdict, and freeing or condemning him accordingly, and, if found guilty, allowing him an appeal, and suspending execution of sentence until the appeal can be heard in the appellate court. Individuals who forcibly take the prisoner from the custody of the state authorities and murder him, to prevent his being dis-

posed of by due process, make it impossible for the state to afford him the enjoyment of the proceedings which make up the state's established course of judicial procedure, and in the strictest constitutional sense prevent and destroy the citizen's enjoyment of the right, privilege, or immunity to have the state afford him due process of law.

6. SAME—FOURTEENTH AMENDMENT—POWER OF CONGRESS.

The authority given Congress to enforce the provisions of the fourteenth amendment regarding the equal protection of the laws, and affording due process of law, involves the exercise of power of a two-fold nature. As to the first provision, the power is contingent, and dependent for rightful existence upon the necessity for correcting wrongs by the state or its officers. As to the other provision, the power to enforce it includes and involves the power and duty to legislate for the protection of the right, privilege, or immunity of the citizen, which the amendment creates, to have the state afford him due process, although the state itself may not be at fault, against obstruction or impairment by private individuals, who defeat the efforts of the state to afford due process when it is seeking so to do, and thereby destroy the citizen's enjoyment of the right, privilege, or immunity to have the state afford him due process of law. The latter power Congress may exercise under the implied power given by the fourteenth amendment itself, or under it and section 8 of article 1 of the Constitution.

(Syllabus by the Court.)

## Habeas Corpus.

The petitioner applies for discharge on habeas corpus, on the ground that the indictment under which he is held does not charge any offense against the laws of the United States. He is indicted, with others, for conspiracy, and acts done in furtherance of it, under sections 5508 and 5509 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712].

The indictment contains six counts. Each of the counts alleges, in substance, that Maples, a citizen of the United States, was, at the time of his murder, lawfully confined by the sheriff of Madison county, state of Alabama, in the jail thereof, to answer the charge of murder under the laws of the state of Alabama; and that the sheriff and a detachment of the Alabama National Guard, which he had summoned to his assistance, were endeavoring to safely keep Maples, to prevent the conspirators from hanging him, that he might have a trial according to law; and that the conspirators, in the city of Huntsville, within the jurisdiction of the court, went upon the highways and streets of the city of Huntsville on September 7, 1904, and murdered Maples by hanging him by the neck until he was dead, in order to prevent his enjoyment of the rights and privileges named in the several counts. Some of the counts allege that Maples was a negro citizen, and the conspirators who formed the conspiracy and committed the murder were white men, and that they were moved to the conspiracy and acts done in pursuance thereof, because Maples was a negro, with the intention, on that account, to deprive him of the rights, privileges, and immunities specified in the counts. All the counts allege that the conspiracy and acts done in furtherance of it were "to injure, oppress, threaten, and intimidate" Maples in the enjoyment of a right, privilege, or immunity "secured to him by the Constitution and laws of the United States," specified respectively in the counts as follows: (1) The right, privilege, and immunity secured to him under the Constitution and laws of the state of Alabama to be tried by due process of law, and acquitted, if innocent, and punished if found guilty, in the courts of the state of Alabama. (2) The right, privilege, and immunity to have the state of Alabama, acting by and through its officers, to afford him a trial by due process of law, and to be held harmless if innocent, and to be punished if guilty, only after trial in the courts, upon accusation of crime preferred against him, when he was in the custody of the officers of the law of the state of Alabama, upon the charge against him of murder under the laws of said state, and was then and there being held by the officers of said state in the jail of Madison county, Ala., for the purpose of affording him

such trial. (3) The right or privilege to enjoy immunity against the lawless acts of white men, intended to deprive him of the enjoyment of civil equality before the law with the white race as to a ·trial and right of trial by due process of law in the courts of the state of Alabama, as is enjoyed by white men under the laws of the state of Alabama when accused of crime against its laws. (4) The right, privilege, and immunity to have the state of Alabama, acting by and through its officers, to afford him a trial by due process of law upon accusation of crime preferred against him, when he was at the time in the custody of the officers of the law of the state of Alabama upon the charge of murder under the laws of said state, and was then being held in the county jail of Madison county for the purpose of affording him such trial. (5) The right to the full and equal benefit of the laws of the state of Alabama for the security of his person as is enjoyed and exercised by white citizens thereof, and the right not to be deprived of his life, without due process of law, on account of being a citizen of African descent and of color. (6) The right not to be denied, on account of his race, the full and equal benefit of the laws of the state of Alabama for the security of his life and person when confined by state authority upon the charge of murder, and due process of law in having the accusation heard and determined by a court of the state and by the verdict of a jury of his peers.

Cooper & Foster and Shelby Pleasants, for petitioner.
Thos. R. Roulhac, Dist. Atty., opposed.

JONES, District Judge (after stating the facts). Whether or not ·Maples, a negro citizen, had the right, privilege, or immunity, under the Constitution and laws of the United States, to be free from lawless violence at the hands of white men, intended, on account of his race, to prevent his enjoyment of civil equality before the law, "as is enjoyed by white citizens," depends upon the proper construction of the thirteenth amendment and valid legislation under it.

In the Civil Rights Cases, 109 U. S. 20, 3 Sup. Ct. 28, 27 L. Ed. 835, the Supreme Court said that the thirteenth amendment "is undoubtedly self-executing, and by its own unaided force and effect abolished slavery and established universal freedom." It was further said that "it authorized legislation for the protection of the freedom it intended to secure, which might be direct and primary in its nature, operating upon the acts of individuals, whether sanctioned by legislation or not." In Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676, speaking of the thirteenth amendment, as well as of the fourteenth and fifteenth amendments, the court said:

"One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude, in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the state."

It is further said of the thirteenth amendment, as well as the others, in the Slaughterhouse Cases, 16 Wall. 36, 21 L. Ed. 394:

"One pervading purpose found in them all, and lying at the foundation of each, and without which none of them would have been even suggested, was the freedom of the slave race, and the security and firm establishment of that freedom, and protection of the rights of the newly made freeman and citizen from the oppression of those who had previously exercised unlimited dominion over them."

The condition of affairs existing in some of the states shortly after the adoption of the amendment, as stated in the Slaughter-

house Cases, 16 Wall. 36, 21 L. Ed. 394, resulted in the passage of an act on April 9, 1866, c. 31, 14 Stat. 27, commonly known as "the Civil Rights Bill," entitled "An act to protect all persons in their civil rights and furnish the means of their vindication." The first section, codified as section 1977 of the Revised Statutes [U. S. Comp. St. 1901, p. 1259], was readopted in substance after the adoption of the fourteenth amendment. That section provides that:

"All persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, penalties, licenses, taxes. and to exactions of every kind, and to no other."

If the thirteenth amendment, as the Supreme Court declares, "by its own unaided force abolished slavery and established freedom," and Congress was expressly vested with power to enforce it, it is impossible, in the light of its known history and purpose and the decisions cited above, to doubt that Congress had authority to pass the first section of that act. Mr. Justice Swayne, in United States v. Rhodes, 1 Abb. 28, Fed. Cas. No. 16,151, held that the "emancipation of one who was a native-born slave, by removing the disability of slavery, made him a citizen without any further act of Congress." Mr. Justice Bradley, in United States v. Cruikshank, 1 Woods, 308, Fed. Cas. No. 14,897, said:

"As the disability to be a citizen and enjoy equal rights were deemed one form or badge of servitude, it was supposed that Congress had the power under the amendment to settle this point of doubt, and place the other race on the same plane of privilege as that occupied by the white race. Conceding this to be true, which I think it is, Congress then had the right to go further, and to enforce its declaration by passing laws for the prosecution and punishment of those who should deprive or attempt to deprive any person of the rights thus conferred upon him. Without having this power, Congress could not enforce the amendment. It cannot be doubted, therefore, that Congress had the power to make it a penal offense to conspire to deprive a person, or to hinder him in the exercise and enjoyment, of rights and privileges conferred by the thirteenth amendment, and the laws thus passed in pursuance thereof. * * * To constitute the offense, therefore, of which courts of the United States have the right to take cognizance under the amendment, there must be the design to injure a person or deprive him of the equal right of enjoying the protection of the laws, by reason of his race, color, or previous condition of servitude."

The views of Mr. Justice Bradley and Mr. Justice Swayne, in the cases cited, as to the power of Congress to protect the freedom given by the amendment, and in what it consisted, were approved by the Supreme Court of the United States in The United States v. Harris, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290. See, also, what is said of Cruikshank's Case in this regard in Logan v. United States, 144 U. S. 288, 12 Sup. Ct. 617, 36 L. Ed. 429.

The character of the freedom intended to be conferred and enjoyed was symbolized, in the minds of the framers of the constitutional amendment, and the legislation intended to accomplish its purpose, by the civil rights enjoyed by the dominant race, or, to quote the language of that section, "as is enjoyed by white citi-

zens." This civil equality must not be confounded with social or political rights. As this was the standard of the freedom conferred and the measure of the rights which constituted that freedom, and as the purpose of the legislation, under the amendment, was to secure and protect the former slave race from the aggressions of the master race, it is quite clear that the right to be free from attacks by members of one race, designed and intended to prevent the other race from enjoying the civil rights which go to make up that freedom, is a right, privilege, or immunity "accorded by, or arising under, or dependent upon the Constitution," and that such rights may be protected by Congress. Cruikshank v. United States, 1 Woods, 303, Fed. Cas. No. 14,897, United States v. Rhodes, 1 Abb. 28, Fed. Cas. No. 16,151; Civil Rights Cases, 109 U. S. 23, 3 Sup. Ct. 18, 27 L. Ed. 835; United States v. Morris (D. C.) 125 Fed. 322.

Whatever may be said of any other murder of a negro by white men, it is undeniable, when a negro is taken by white men from the custody of the state authorities, when he is being held for trial on accusation of crime against state laws, and put to death to prevent his having such trial, because of race hostility, that the manifest result, as well as intent, of such act, is to deprive him, because of his race, of the enjoyment of a civil right accorded by law to white freemen. Such an act, perpetrated in that manner, and with that intent, because of race malevolence, assails the negro's civil equality because of his race, and, by denying the enjoyment of that right with that motive, attacks the enjoyment of the freedom—the civil equality—which the amendment, and legislation under it, secures to him.

2. It is said, of the counts based upon violations of rights or privileges claimed under the fourteenth amendment, that no complaint is made of the laws of the state, or of the modes of enforcing them, but that, on the contrary, it is shown the state was without fault, and that its civil and military power was overwhelmed while the state was endeavoring to protect Maples from the mob, in order to afford him a trial by due process of law; and, this being so, it is insisted that a case is presented in which the United States has no power to legislate for the punishment of the offenders in any aspect in which the matter may be viewed. The fact that the state was without fault and endeavoring to do its duty, however, does not take away all power of Congress to legislate under that amendment, and is material only in determining the channels in which that power may be exercised. The duty of affording due process of law to all persons was an original duty of the state, and, prior to the fourteenth amendment, was not a matter of concern to the general government. That amendment made the performance of the duty by the state a matter of national concern, and, if need be, of national supervision. It was not the intention of the states, in adopting this amendment, to confer power upon the general government to undertake the general or initial duty of affording due process of law. The purpose was that the state should continue to administer justice and punish crime, but subject to the authority

conferred by the fourteenth amendment upon Congress. When, therefore, the amendment contemplates that the state shall continue to discharge the duty, and forbade the states, in the performance of it, to deny due process, the prohibition, ipso facto, inevitably became nothing more or less than a positive command that the states shall afford due process to all persons, and certainly to all citizens. It resulted from the judicial power of the United States that the Supreme Court became the final arbiter of what constituted due process of law and the equal protection of the laws; yet the main purpose of the amendment was to increase the power of Congress. It is Congress to which is given the power "to enforce" the duty by appropriate legislation. Ex parte Virginia, 100 U. S. 345, 25 L. Ed. 676. The Supreme Court has declared of these provisions that "they are to some extent declaratory of rights, and, though in form prohibitions, they imply immunities such as may be protected by congressional legislation." The power of Congress under the amendment, as to the performance of the duty thus enjoined upon the state, has therefore a twofold aspect. The first concerns the right to interfere with state laws or state power. That can be done only when the state is at fault—when the state either refuses to afford due process of law, or its officers refuse to execute the laws, or execute them with vicious purpose or uneven hand. Then, and not until then, can federal power step in and displace or alter state laws, or interfere with state officers. Then the interference with state law or power must be confined to dealing with the particular evil, and to providing an effective cure for it. The other phase of the power concerns the protection of the rights which the amendment gives, though the state may not be at fault, and the power of Congress to aid the state, in the performance of its duty, by removing obstruction or resistance, by private lawlessness, to the successful performance of the duty.

The vital purpose of the amendment in imposing the duty upon the state under this clause is not merely to secure formal recognition of the right in the Constitution and laws of the state, and provisions to enforce them, which, unless they are enforced, amount only to parchment due process of law, but that the duty should be so performed that it will result not merely in having proper laws and officers, but in the full enjoyment of the benefits of the operation of due process of law in individual cases. When a private individual takes a person charged with crime from the custody of the state authorities to prevent the state from affording him due process of law, and puts him to death to punish the crime and to prevent the enjoyment of such right, it is violent usurpation and exercise, in the particular case, of the very function which the Constitution of the United States itself, under this clause, directs the state to perform in the interest of the citizen. Such lawlessness differs from ordinary kidnapping and murder, in that the dominant intent and actual result is usurpation and exercise by private individuals of the sovereign functions of administering justice and punishing crime, in order to defeat the performance of duties required of the state by the supreme law of the land. The inevitable effect of such

lawlessness is not merely to prevent the state from performing its duty, but to deprive the accused of all enjoyment, or opportunity of enjoyment, of rights which this clause of the Constitution intended to work out for him by the actual performance by the state of all the things included in affording due process of law, which enjoyment can be worked out in no other way in his individual case. Such lawlessness defeats the performance of the state's duty, and the opportunity of the citizen to have the benefit of it, quite as effectually and far more frequently than vicious laws, or the partiality or the inefficiency of state officers in the discharge of their constitutional duty. It is a great, notorious, and growing evil, which directly attacks the purpose which the Constitution of the United States had in view when it enjoined the duty upon the state.

Upon what principle, then, can it be said, because the state is not at fault, that all power given Congress by this amendment is thereby rendered inert, and that it cannot exercise even the incidental power of punishing lawless resistance by private individuals to the state's performance of this duty in order to protect the right, when such exercise of the power by Congress does not displace state laws or interfere with state officers? Such legislation is certainly "appropriate," in the sense that it is adapted to carry out the purposes of the amendment, and certainly directly aids its accomplishment. If it can be criticised as not being "appropriate," it can only be in the sense that it is in excess of authority. If we regard the rule that "when the end is required the means are given" (Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060; Legal Tender Cases, 12 Wall. 536, 20 L. Ed. 287; The Legal Tender Case, 110 U. S. 421, 4 Sup. Ct. 122, 28 L. Ed. 204); the right of Congress to legislate against such acts of private individuals is plainly implied in the power given to enforce the amendment. Section 5508 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712], as applied to such a case, can be sustained under that power; for its application deals only with acts that subvert the performance of the duty, without in any way interfering with or touching the power of the state or its laws.

If, however, such power is not implied in that amendment, it is certainly not prohibited by it, and may be exercised by Congress if it can be found in any other provision of the Constitution. It is stated by Mr. Justice Strong, in delivering the opinion of the court in the Legal Tender Cases, 12 Wall. 536, 20 L. Ed. 287, that "the existence of a power may be deduced from one or more of the substantive powers expressed or defined, or from them all combined, and that it is allowable to group any number of them, and infer from them all that the power has been conferred." It was also declared in the same case that a "power may exist as an aid to the execution of an express power, or the aggregate of such powers, though there is another express power given relating to the same subject, but less extensive." 12 Wall. 536, 20 L. Ed. 287. The last clause of section 8, art. 1, empowers Congress to make all laws which shall be "necessary and proper" for carrying into execution the "foregoing powers and all other powers vested by this Constitution in the

government of the United States, or any department thereof." The Supreme Court has held that the amendment is an "additional guaranty" for the enforcement of due process of law at the hands of the state, and that the power was conferred upon Congress to see that the duty guarantied was performed. Certainly, if the legislative power to guaranty the performance of the duty is vested in Congress by the fourteenth amendment itself, Congress has power under section 8 of article 1 to pass all laws which shall be "necessary and proper" to carry into execution that guaranty. The legislative power to make good the guaranty involves the power to protect state officers when endeavoring to discharge the constitutional duty, and to punish private individuals who resist the execution of the laws, by whose enforcement alone the duty can be accomplished, and the rights, privileges, and immunities enjoyed, which the amendment intended to bestow, when it required the performance of the duty at the hands of the state.

The principle upon which such legislation is vindicated is illustrated and upheld in Ex parte Siebold, 100 U. S. 372, 25 L. Ed. 717. In that case laws of the United States were involved which imposed penalties upon state officers for not performing their duty as commanded by state law, so far as it affected the election of Congressmen and presidential electors. The court held that the duties to be performed were "due to the United States, as well as to the state," and that Congress could rightly make such violation of state laws an offense against the United States. It was said this power necessarily followed from "the direct interest" which the national government had in the subject. The national government, having a direct interest in the performance of the duty here, can protect officers who are charged with it. The right to protect the officer in discharge of the duty involves the power to punish private individuals who assail the officer to prevent his performing it. The general government, certainly, has as direct and deep an interest in securing the successful performance of the duty to furnish due process of law, which is required of the state to secure the enjoyment of fundamental rights of citizens of the United States, as it has in the performance of duties, by state officers under the state law, affecting the election of congressmen and presidential electors. It has also been held in numerous cases that the function which a party is performing determines whether Congress has the right to protect him in performing a duty enjoined or in the exercise of a right or privilege. A state officer in attempting to afford due process in a particular case is discharging a duty imposed upon him, as the representative of the state, by the Constitution of the United States, for the benefit of its citizens. The prisoner also, while confined and being protected against lawless violence, that he may have a trial according to the law of the land, is in the exercise or enjoyment of a right given him by the Constitution. Congress may protect the right by protecting the performance of the duty, and the rights which flow from it, by declaring that violations of state laws on the subject constitute offenses against the United States. Ex parte Siebold, supra. Indeed, whether an act constitutes an

offense against the United States, as well as the state, very frequently turns upon the intent with which it is done. United States v. Cruikshank, 1 Woods, 308, Fed. Cas. No. 14,897; United States v. Waddell, 112 U. S. 80, 28 L. Ed. 673. Congress, instead of making violation of state laws which protect the right a substantive offense under the federal law, may strike at the evil effect of private lawlessness upon the right, and punish conspiracy to harm the right, and, in that connection, acts done to carry it out. Sections 5508 and 5509 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712] are framed upon this latter principle.

It is nothing new in our jurisprudence for Congress to legislate against lawless acts of private individuals, to aid and protect state officers in the performance of duties which the Constitution of the United States requires of them, although such duty is due only to the public or government, and not directly due to any particular individual, and although the provisions of the Constitution imposing the particular duty give Congress no power to coerce or supervise its performance. Under the Constitution, Congress is without power to compel the state to which the fugitive from justice has fled to surrender him upon the "demand of the Governor" of the state from whence the accused fled. This is only a moral duty addressed to the conscience of the state; yet, when the state undertakes to obey the Constitution, and enters upon the performance of the constitutional duty, Congress steps in and punishes individuals who interfere with the agents of the state in the discharge of that duty. For more than a century there has been a statute, now codified as section 5279 of the Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3597], the constitutionality of which has never been doubted, which puts a penalty upon persons who interfere with the agents of the demanding state, though, in the language of the Supreme Court, "they are the mere agents of the state, with authority to receive the fugitive from justice." Robb v. Connolly, 111 U. S. 634, 4 Sup. Ct. 544, 28 L. Ed. 542. What difference is there in principle between legislation of Congress which punishes private individuals who rescue a fugitive from justice, in the custody of the agent of the demanding state, to prevent the fugitive's return, as required by the Constitution, and legislation which punishes private persons who take a prisoner from the custody of state officers who are holding him to give him a trial by due process of law on accusation of crime, and murder such prisoner to prevent the performance of the duty which, under the Constitution, is "due to the United States as well as to the state," and as well, also, to the citizen?

No one can deny that the fourteenth amendment conferred upon the citizen the right, privilege, or immunity to have his state afford him due process of law on accusation of crime against him, and that a right or privilege was thereby vested in the citizen, under the Constitution of the United States, to have the state perform this duty. The very words of this clause, by their own unaided force, inevitably utter a command that the state shall afford due process to the citizen. It is therefore a right, privilege, or im-

munity of a citizen of the United States to have the state afford him due process of law. It is a universal rule of law, and common sense as well, that the grant of a right or privilege carries with it every right or privilege necessary to the enjoyment of the right granted, unless withheld by the terms of the grant. The grant here makes no such exception. The constitutional right of the citizen cannot bear fruit, or ripen into the enjoyment of due process at the hands of the state, if lawless outsiders prevent state officers from performing their duty concerning it. The right, privilege, or immunity of a citizen of the United States under this clause, which is to have his state give him the benefit of due process of law, therefore, necessarily carries with it and includes in it the right, privilege, or immunity to enjoy freedom, exemption, from lawless assault, which supervenes between the state and the performance of its duty, and by such violent interference prevents the citizen having, when the state is endeavoring to afford it, due process at the hands of the state.

There is no valid legislation of Congress which protects the enjoyment of this right by criminal penalties, except section 5508 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712]. That statute does not define the right or privilege here considered, or particularize the rights it is designed to protect, but is directed to the punishment of conspiracies to deprive any citizen of the enjoyment of any right or privilege "secured to him by the Constitution or laws of the United States." In considering its application to this case, we must be careful not to overlook what part of the right or privilege is involved and remains to be guarded when the state is endeavoring to afford due process of law, and is assailed, to prevent it from doing so, by private individuals. The privilege or immunity, then, is the right or privilege to freedom or exemption from lawless attacks on the discharge of the duty by the state, which prevent the state, acting through its officers, from administering due process, and thereby frustrate the citizen's enjoyment of the protection which the Constitution intended to effect for him when it gave him the immunity or right to have due process of law at the hands of the state. When the state is endeavoring to do its duty, such lawlessness is the only means by which the enjoyment of the right or privilege can be breached. It is the attack upon the endeavor of the state to perform the duty, and not the crime committed under the state laws against the person of the citizen, which determines whether the enjoyment of the right has been assailed, or the state has been prevented from dispensing due process of law to the citizen in the constitutional sense. The wheels of justice must be stopped by unauthorized force, after they have been put in motion, to bring the offender in a case like this within the grasp of section 5508.

The state, in the first instance, discharges its full constitutional duty, under this clause, of affording due process to every person in the jurisdiction, by passing proper laws for the protection of rights of person and property, and giving proper means of enforcing them After doing that, it cannot be lacking in the duty of affording due

process to any person, as to any wrong to person or property, until the nature of the case calls for the further administration of due process, which constitutes the second stage of the duty, and in the particular case. Then the duty of affording due process, which in its first stage involved only the exercise of legislative power, in passing laws, or of executive power, when the appointment of officers is put upon the executive, may involve the administration of judicial process in the particular case. So far as the duty of affording due process depends upon legislation, it is a general duty owed alike to everybody, and the right is given, and the duty discharged, and the privilege enjoyed, so long as such laws remain in force and are fairly executed. The second stage of affording due process includes the obligation in many instances to administer judicial procedure in the individual case, and is due to a particular person. The state cannot be said to be prevented from performing the duty of affording due process, where it involves the necessity of administering judicial procedure, unless, after the occasion has arisen for judicial proceedings, the state has been overawed from attempting the duty, or, having begun the performance of it, is subsequently compelled to abandon it. Before the state can be said to have been prevented from discharging the duty of affording due process, where it involves the administration of judicial procedure, some proceeding must have been begun, in some tribunal, regarding the citizen or person, in which some right is asserted against him, or claimed by him, which the state, through its officers, is attempting to afford, and they must have been directly prevented by lawless resistance to their efforts from continuing the effort to administer justice in that case. Hence, when a person is murdered, although his life has been taken in violation of law, and in that sense he has been taken off without due process, the state cannot be said thereby to have been prevented from discharging the duty of affording him due process of law, in the constitutional sense, unless such citizen was in the custody of the authorities of the state for violation of its laws, or some proceeding was being actually attempted or carried on in the courts, for the adjudication and enforcement of some right in which he was concerned, wherein the state was prevented from adjudging and enforcing the right, through judicial procedure, by direct attack made upon its officers, frustrating their endeavors to perform their duties. It is, we repeat, resistance to the efforts of the state's officers to perform their duty, preventing them from doing the things which the law requires them to do, which defeats the state's discharge of the duty of rendering due process of law, and thereby assaults the enjoyment of the privilege or immunity of the citizen to have due process at the hands of the state. The right of the citizen to have the duty performed, which Congress is given power to enforce, necessarily carries with it the right to have protection against lawless acts of outsiders which prevent the state from giving them the benefit of due process of law. The right being given, and duty being put upon Congress to protect it, the duty to protect carries with it, even in the absence of special authorization, the power of protecting the enjoyment of the right, and

authorizes Congress to adopt any legitimate means which is best adapted to attain the object. As said in Prigg v. Commonwealth, supra, "the fundamental principle applicable to all cases of this sort would seem to be that, when the end is required, the means are given; when the duty is enjoined, the ability to perform it is contemplated to exist in the functionary to whom it is intrusted." As the thing which the statute punishes here is the attack upon the prisoner's right to have judicial procedure administered at the hands of the state, and the resistance to the state's effort to afford the enjoyment of the citizen's privilege or immunity, rights dependent upon or secured by the Constitution of the United States, there is no force whatever in the suggestion that the principle which justifies the application of section 5508 to this case involves power in Congress to punish ordinary murder, or other mere trespass upon person or property, or invades the domain of state power in any way. United States v. Moore (C. C.) 129 Fed. 630.

3. The precise question here was not mooted in either the Civil Rights Cases or in Harris v. United States, nor was its decision necessary to the judgment in those cases. The Harris Case involved nothing under the fourteenth amendment, except the inquiry whether private individuals could deprive a citizen of the enjoyment of the "equal protection of the laws" in the constitutional sense, and whether Congress had power to pass laws which constitute the legal system in which consists the equal protection of the laws. The Civil Rights Cases involved the power of Congress to secure rights claimed under the recent amendments, by general legislation, "which steps in the domain of local jurisprudence, and lays down rules for the conduct of individuals in society to each other," without reference to state laws or state action, concerning equal accommodations on carriers and at inns and places of public entertainment. It was decided that the privilege or right to such accommodation was not given or secured by the thirteenth amendment. The court declined to decide whether it was given or secured by the fourteenth amendment, contenting itself with holding that the interference by the particular statute with state laws went beyond the limits of the evil to be remedied, which alone authorized federal interference, and was therefore not "appropriate." It was the plenary power of Congress over state laws and state officers, when the state was not at fault, and not auxiliary power of Congress or its right to punish individuals who prevented the enjoyment of a right secured to the citizen under the Constitution and laws of the United States, which was there involved and decided. The Supreme Court could not have decided against the right of Congress in enforcing a constitutional right, or immunity, to deal with lawless individuals who attack the rights, without overruling, which plainly it did not intend to do, a long line of decisions, beginning with Prigg v. Commonwealth, 16 Pet. 539, 10 L. Ed. 1060, whose principles have been frequently reasserted in subsequent cases, coming down to Motes v. United States, 178 U. S. 462, 20 Sup. Ct. 993, 44 L. Ed. 1150, which was decided 16 years after the Civil Rights Cases.

4. This opinion might well stop here; but in view of the great importance of the subject, the fullest discussion cannot be out of place. The equal protection clause makes but one demand upon the state, and gives the citizen a single right only. It is that the state must make and execute its laws fairly and impartially. It must not grant rights to one which, under similar circumstances, it denies to another. This command is fully obeyed when the state passes impartial laws, and provides proper officers to execute them, and they endeavor to do so. The constitutional command is only that the state create and enforce a legal status. When that status is created and the state's officers endeavor to maintain it, the state, under this clause, has done its full duty to the citizen. The citizen is thereby put in full possession and actual enjoyment of the right the Constitution confers upon him. No act of a private citizen can defeat the enjoyment of this status, since it can be created only by the exercise of legislative power, and impaired only by acts of officers, those who wield state authorty, by refusing to enforce these laws, or enforcing them with uneven hand or vicious purpose. State power, which a private citizen does not possess and cannot wield, alone can impair the enjoyment of the right. When the state, including therein officers who wield its power, has done its duty, the system of the state, the laws for the prevention and punishment of wrongs and enforcement and vindication of rights, in which consists the thing which constitutes "the equal protection of the laws," is wholly and entirely the creation of the state, deriving its origin and force solely from the power of the state. The state may grant what it pleases and withhold what it pleases, doing so impartially; for this clause neither commands the state to give any particular right, nor forbids it to withhold any particular right. Whatever is actually given is a gift of the state, in no wise secured by or dependent upon the Constitution of the United States. Whether these laws are obeyed or resisted by private individuals, it amounts to nothing more than loyalty or disloyalty to state authority. The resistance to these laws by private individuals cannot blot out the fact that the state has passed proper laws and appointed proper officers to execute them, and thereby afforded "the equal protection of the laws"—the status the Constitution commanded it to confer upon the citizen—and that in consequence he has full enjoyment of the right or status.

On the other hand, how is it with the right, privilege, or immunity flowing from the right of the citizen to have the state afford him due process? Is it dependent wholly upon state law? Cannot its enjoyment be defeated in the constitutional sense, by the act of private individuals, although neither the state laws nor officers are at fault? The general duty of the state to afford due process of law to all persons is discharged, in the first instance, as we have seen, by the passage of proper legislation, and providing proper modes for securing the enjoyment of life, liberty, property, and the pursuit of happiness. This, however, is in no wise true of another phase of the duty, such as arises here, when the right to have due process at the hands of the state involves the enjoyment

of the due administration of judicial procedure. When that is the case, there are many things which the state and its officers must do or cause to be done, and in individual cases, by physical and mental operations, as distinguished from the exercise of legislative or political power, before the citizen can have the enjoyment at the hands of the state of due process of law. When the state seeks to punish the citizen for crime, it must not only give the accused a right to appear before a lawful tribunal, but it must afford the opportunity as well. Having put the accused in jail, it must keep him safely and bring him before that tribunal. When it brings him there, it must bring his witnesses there, if they will not come. In Alabama it must confront him with a panel of his peers, from among whom he and the state elect a jury. A judge must be there to give the jury the law, and the prisoner may except and appeal, if dissatisfied with his rulings. The judge and jury must hear counsel in the prisoner's defense. Then the state must cause the jury to retire, where they will be guarded from outside influence, while they deliberate upon the guilt or innocence of the defendant, and then come again in court, in the prisoner's presence, and return a verdict. The prisoner, if dissatisfied, may poll the jury. He has the right to present whatever he can to the judge before sentence is pronounced, if found guilty, and then to have execution of the sentence suspended until his appeal to the Supreme Court can be heard.

Is it not clear that private individuals who overpower state officers, when they are endeavoring to protect a prisoner accused of crime, whom they have confined to the end that both he and the state may exercise their respective functions and rights before a judicial tribunal, and wrest the prisoner from their custody, and then murder him to punish him for the crime, do, in the constitutional sense, as well as in every other sense, deprive the prisoner of the enjoyment of due process at the hands of the state, and prevent the state from affording it? No one can deny that, under the Constitution, it is the prisoner's right to enjoy the workings of such due process, and that it is the duty of the state, under the fourteenth amendment, to dispense such justice to him. These rights cannot be enjoyed, or the duty enjoined upon the state discharged, except from the undisturbed working of the machinery of justice after its power has once been put in motion, until the period arrives in the particular case where it may rightly stop. Until it has done its perfect work, the administration of due process, which in a case like this cannot be enjoyed except by the regular and orderly working of judicial procedure, is not afforded by the state. It may be true the state was not at fault; but that does not obliterate the fact that it was prevented from causing to be done the physical and mental acts which alone constitute the discharge of the duty in this case, and that by means of lawless violence, directed at the state and the prisoner alike, the prisoner has been prevented from enjoying the right to have the state do or cause to be done the physical or mental tasks which alone can afford him due process of law.

It cannot be contended, with any foundation in reason, that the

right, privilege, or immunity of the accused to have due process at the hands of the state is neither derived from nor secured by the Constitution of the United States. The phrase "due process" has had a well-defined meaning for ages. It had been previously employed in the fifth amendment. Putting it in the fourteenth amendment not only granted, but directly defined, certain specific rights which inure to the benefit of every person, alien as well as citizen, and are "derived from, dependent upon, or secured by the Constitution of the United States." The right thus created and defined, in a case like this, involving life and liberty, is the right to enjoy the benefits of all proceedings which constitute a trial according to "the law of the land." But it cuts deeper than this. The law of the land, applying to all persons impartially, might not afford some of the rights which this clause of the Constitution grants and secures to the citizen and compels the state to afford. If, for instance, the state should deprive a person of the benefit of counsel, it would not be due process of law. If it allowed a private person to pass judgment on him for crime, it would not be due process. Within certain limits the state may change its remedies at pleasure, but it must be "with due regard to the landmarks established for the protection of the citizen." It must not exercise "arbitrary power, or depart from the principles of private right and distributive justice." As declared by the Supreme Court, the fourteenth amendment, in its requisition concerning due process, "is not too vague and indefinite to operate as a practical restraint." Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 111, 28 L. Ed. 232. As there declared, "due process must, in the language of Mr. Webster, be, according to his familiar definition, the general law, or law which hears before it condemns, and which proceeds upon inquiry and renders judgment."

The amendment, inevitably, compels the state to provide impartial laws, and lawful tribunals in which to enforce them, which proceed upon fixed principles, and not arbitrarily, before which the accused has the opportunity as well as the right to appear, offer evidence, confront his accusers, and defend himself, and then to be punished or freed by that tribunal, as in its opinion he merits. Nothing less than this will satisfy the Constitution. All this it gives or secures. The circumstance that such rights are recognized or given in the Constitution or laws of the state does not take away any right the Constitution gives concerning them, or make them any the less secured by or dependent upon the Constitution of the United States. Vincennes University v. State of Indiana, 14 How. 277, 14 L. Ed. 416. Nor is their constitutional consequence in this respect changed in any way because the state, in the exercise of its power in other respects over the right, confers other rights or remedies which, under its jurisdiction, go to make up "its established course of judicial procedure," which things the Constitution of the United States, by force of this provision, also compels the state to afford. . The vital, constituent elements of the right, we repeat, are created or secured by the Constitution of the United States. The state may give more, but it cannot give any less. It is apparent, therefore, that there is a marked difference in the sweep of the rights,

privileges, or immunities which flow respectively from these two clauses. Under the first, when there is no improper discrimination, all that is given is the bounty of the state, and it may contract, or expand, or deny rights at pleasure. The system which constitutes the equal protection of the law is, then, wholly the creature of the state. As the things forbidden under the equal protection clause can be effected only by state power, it is impossible, in the nature of things, for a private citizen to impair the citizen's enjoyment of the right. Under the due process clause, the vital essence of the grant, of what it shall consist, flows from the Constitution of the United States itself. It is beyond the power of the state in any way to withhold anything thus granted. From the very nature of the right, whenever the administration of due process involves the administration of judicial procedure, the state must not only pass fair laws, but through its officers must do, or cause to be done, certain physical and mental oprations in individual cases, which operate directly upon a particular individual, the benefits of which he cannot enjoy unless the officers of the state are permitted to perform them or cause them to be performed, according to the established course of judicial procedure, when he is present and asserting his rights. Undoubtedly, then, private persons may defeat enjoyment, in the constitutional sense, of the right, privilege, or immunity of the citizen to have the state afford him due process of law in many cases.

5. This class of cases presents, perhaps, the only instance in which Congress has power to protect rights of the citizen under the fourteenth amendment by punishing acts of private individuals which defeat the enjoyment of such rights, when the state is not at fault. The power of Congress rests upon and is vindicated by the consideration that the Constitution commands the state to perform a duty for the benefit of the citizen, thereby creating a constitutional right in that citizen to have the state do that thing for him, and that the resistance to the state's efforts to perform the duty frustrates obedience to the mandate of the Constitution, and thus directly cuts from under the citizen all opportunity to enjoy a right which can be saved in no other way than by performance of the duty by the state. The prohibition put upon the power of the state to deny due process in the administration of justice certainly creates a right in the citizen. The Constitution makes it a matter of national concern that the states perform the duty of affording due process. This much, at least, arises from the very letter of the amendment. The power given Congress to see that the state performs the duty, naturally includes power to protect the right, and remove obstacles which prevent the state's performing the duty. Has it no power to do so? Must the spirit of the amendment be sacrificed to the letter? What is the spirit of the amendment? It goes to this extent at least: that the citizen, when the state undertakes to enforce rights of individuals or society against him, shall have actual enjoyment of the benefits of due process of law at its hands. Lawless acts by private individuals, which snatch such benefits from the citizen, certainly defy and frustrate the purposes of the amendment. Why has not Congress, which is given power "to enforce" the amendment, power to punish such lawlessness, which directly and inevitably defeats the purpose of the amendment?

This is not a case of a prohibition upon the power of Congress. The question is not whether Congress has been prohibited from doing anything in this connection, but whether it has been granted authority to do anything. The prohibition here is against state power. Congress has been granted authority to enforce the prohibition, in order to secure the results intended to be effected by the prohibition. As was forcibly said in Boyd v. United States, 116 U. S. 635, 6 Sup. Ct. 524, 29 L. Ed. 746, of prohibitions contained in the Constitution upon the powers of Congress:

"A close, literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it were more in sound than in substance. It is the duty of the courts to be watchful of the constitutional right of the citizen."

It is said, however, that Congress has no power to conserve the otherwise conceded immunity of the citizen, because the state has vainly endeavored to protect its enjoyment. It is admitted, if state officers had participated in mobbing Maples, or conspired in any way to deprive him of the enjoyment of due process of law at the hands of the state, that Congress could legislate against and punish such acts on their part. Ex parte Virginia, 100 U. S. 339, 25 L. Ed. 676. But it is urged, because the state was not at fault in these respects, that Congress has no power to punish acts of private individuals which destroy the citizen's right or immunity to enjoy due process of law at the hands of the state. Is it reasonable to suppose, when the protection of the right of the citizen to have due process at the hands of the state was deemed of such paramount importance as to require the adoption of an amendment to the Constitution of the United States, imposing upon Congress the delicate duty of supervising the discharge of the duty by the state, that the framers of the amendment, and the people who adopted it, intended, when the amendment empowered Congress "to enforce" it, that Congress should have no power to punish individuals for doing acts which, if done by state officers, it was within its authority and duty to punish? If the right to be protected here by the effort of state officers depended wholly upon state laws, the general government could not legislate as to it, or concern itself about lawlessness of individuals which assailed a state officer and prevented the performance of his duty, unless called on to lend assistance by the executive or Legislature, under article 4, § 4, of the Constitution. Here, however, the right is secured by the Constitution, and performance of the duty is enjoined upon the state officer by the Constitution, and it is the settled doctrine that Congress may protect such rights by legislation "as it may deem most eligible and best adapted to attain the object." In re Quarles & Butler, 158 U. S. 537, 15 Sup. Ct. 959, 39 L. Ed. 1080. It was well known that the enjoyment of the right might be defeated by violence of individuals preventing the state from performing the duty when it attempted to do so, as well as by faults of state officers. It is, however, insisted that no power has been conferred by the amendment upon Congress to protect the right to its full extent by dealing with one of the chief evils which destroy its enjoyment, because such power must be expressly given, else it does not exist. The answer is furnished by the Supreme Court in two leading decisions—Ex parte Yarborough,

110 U. S. 658, 4 Sup. Ct. 152, 28 L. Ed. 274, and United States v. Waddell, 112 U. S. 80, 5 Sup. Ct. 35, 28 L. Ed. 673. In the former case it is said:

"The proposition that there is no such power is supported by the old argument, often heard, often repeated, and in this court never assented to, that when a question of the power of Congress arises, the advocate of the power must be able to place his finger on the words which expressly grant it."

"It destroys at one blow, in construing the Constitution of the United States, the doctrine, universally applied to all instruments of writing, that what is implied is as much a part of the instrument as what is expressed. The principle, in its application to the Constitution of the United States more than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers, a difficulty which the instrument itself recognizes by conferring on Congress the authority to pass all laws necessary and proper to carry into execution the powers expressly granted, and all other powers vested in the government or any branch of it by the Constitution. Article 1, § 8, cl. 18."

In United States v. Waddell, 112 U. S. 80, 5 Sup. Ct. 35, 28 L. Ed. 673, the court, speaking of the enjoyment of a right dependent upon or secured by the Constitution or laws, said:

"Whenever the acts complained of are of a character to prevent this, or throw obstacles in the way of exercising the right, and done for the purpose and with the intent to injure or oppress a person because he has exercised them, then, because it is a right asserted under the law of the United States, and granted by that law, those acts come within the purview of the statute [section 5508], and of the constitutional power of Congress to make such statute. In the language of the court in Ex parte Yarborough, supra, the power arises out of the circumstances that the function in which the party is engaged, or the right which he is about to exercise, is dependent on the laws of the United States. In both of these cases it is the duty of the government to see that he may exercise this right freely, and protect him from violence while doing so, or on account of so doing."

When a state officer is endeavoring to protect a person accused of crime, that he may be dealt with according to law, can there be any doubt the officer is engaged in a function which the fourteenth amendment to the Constitution commands him to perform? When lawless violence takes a prisoner from the custody of the officer and puts him to death to prevent the discharge of the duty to protect him, is it not clear that such acts "are of a character to prevent this, or throw obstacles in the way of his exercising this right"? Is it not clear also that such acts by private individuals injure or oppress the prisoner in the exercise of the right accorded to him, by the amendment, to have due process at the hands of the state when held in custody for crime, and be protected while awaiting its further administration?

After anxious deliberation and careful examination of all the authorities, the court cannot resist the conclusion that Congress may protect the enjoyment of rights, privileges, or immunities given or secured by the fourteenth amendment, against impairment by lawless acts of private individuals, although neither state laws nor state officers are at fault, if such lawlessness takes the form of violence, directly preventing the state or its officers from affording due process to a prisoner, when the state is attempting to do so, provided such legislation does not go beyond prevention of that evil, and does not attempt to alter or interfere with state laws or the authority of its officers in executing

them. The argument that Congress has no such power because the amendment is directed against denial of due process by the state, and that there is no denial by the state when neither its laws nor its officers are at fault, ignores the pregnant fact that the amendment creates a right, privilege, or immunity of a citizen of the United States to have enjoyment of the benefit of due process at the hands of the state, at least, when the citizen is in its custody and it is proceeding against him for infraction of its laws, and ignores the further equally important fact that such lawless violence of private individuals, by preventing the state's giving the benefit of due process of law when it is endeavoring to do so, directly and inevitably defeats the enjoyment of his right or privilege, created by the Constitution of the United States, to have enjoyment of the benefit of due process at the hands of the state, and thus fatally impairs enjoyment of the right, privilege, or immunity. It is the settled and unbroken doctrine of the Supreme Court of the United States that a right, "whether created by the Constitution of the United States, or only guarantied by it, even without any express delegation of power, may be protected by Congress in such manner and form as Congress, in the legitimate exercise of its legislative discretion, shall provide." This doctrine, which was emphatically enunciated in the great case of Prigg v. Pennsylvania, 16 Pet. 539, 10 L. Ed. 1060, has since been constantly adhered to. Strauder v. West Virginia, 100 U. S. 311, 25 L. Ed. 664; Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648; United States v. Reese, 92 U. S. 214, 23 L. Ed. 563; Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150.

The only way to escape the application of this doctrine to this case is to show either that no right, privilege, or immunity is given by the fourteenth amendment to the citizen to enjoy due process at the hands of the state, when it is endeavoring to afford it, or that violence directed against its officers, which prevents them from doing so, does not deprive the citizen of the enjoyment of the benefits of the discharge of the duty by the state. The decisions of the Supreme Court put it beyond the pale of controversy that the prohibitions upon state power in the fourteenth amendment create rights, privileges, and immunities of citizens of the United States. As said in Strauder v. West Virginia, supra:

"The fourteenth amendment makes no attempt to enumerate the rights it is designed to protect. It speaks in general terms, and these are as comprehensive as possible. Its language is prohibitory, but every prohibition implies the existence of rights and immunities."

The right, privilege, or immunity being thus established, the denial of the right of Congress to protect it must rest upon the false premise that, when a right or privilege is given to the citizen by the Constitution to have the state do certain things for him to secure a particular right for him, and the state is endeavoring to accord the enjoyment of that right, acts of private individuals which directly, violently, and intentionally prevent the state from performing the duty do not prevent the citizen from having the benefit of the performance of that duty at the hands of the state. To state the proposition is to answer it. Who will seriously contend, where the law puts the duty on B. to render a particular service to A., that A. may enjoy a right which the law

intends thereby to secure to him, and which A. can enjoy only by the performance of the duty by B., that violence directed towards B. which prevents his rendering the service to A. does not defeat A.'s enjoyment of that right? The question here, whether enjoyment of any right, privilege, or immunity of the citizen under the fourteenth amendment is violated when the state holds a prisoner on accusation of crime, and is endeavoring to afford him due process of law, and is prevented by violence of private individuals from doing so, has never been before the Supreme Court. That court has been careful to avoid defining the privileges and immunities of citizens of the United States until "some case involving these privileges makes it necessary to do so." Slaughterhouse Case, 16 Wall. 79, 21 L. Ed. 394. General expressions in opinions not raising the question here, are not in any wise binding in determining whether the acts charged in the indictment constitute a violation of any right, privilege, or immunity of a citizen of the United States. It suffices to say of those opinions, without citing them, that they combated the power of Congress, under this amendment, to enter upon plenary legislation altering or interfering with state laws, when neither the state nor its officers are at fault, and that they do not touch the power of Congress, by appropriate legislation, to protect any immunities or rights which the amendment gives, although the state is not at fault, against the acts of lawless individuals, if such legislation does not go beyond the cure of that evil. The Supreme Court itself has repeatedly declared "that any opinion given here or elsewhere cannot be relied upon as binding authority, unless the case calls for its expression." Carroll v. Carroll, 16 How. 275, 14 L. Ed. 936; Bardes v. Hawarden, 178 U. S. 534, 20 Sup. Ct. 1000, 44 L. Ed. 1175; Cohens v. Virginia, 6 Wheat. 399, 5 L. Ed. 257; Bryan v. Bernheimer, 181 U. S. 197, 21 Sup. Ct. 557, 45 L. Ed. 814.

The court does not doubt that Congress has power to punish the acts charged in the indictment, and that sections 5508 and 5509 of the Revised Statutes [U. S. Comp. St. 1901, p. 3712] apply to them, and are "appropriate" legislation to that end. The result is that the writ must be discharged, and the prisoner remanded to the custody of the marshal.