OZIE POWELL, WILLIE ROBERSON, ANDY WRIGHT, AND OLEN MONTGOMERY v. ALABAMA.

HAYWOOD PATTERSON v. SAME.

CHARLEY WEEMS AND CLARENCE NORRIS v. SAME.

Nos. 98, 99, and 100. Argued October 10, 1932.—Decided November 7, 1932.

46

*Mr. Walter H. Pollak,* with whom *Messrs. Carl S. Stern* and *George W. Chamlee* were on the brief, for petitioners.

*Mr. Thomas E. Knight, Jr.,* Attorney General of Alabama, with whom *Mr. Thos. Seay Lawson,* Assistant Attorney General, was on the brief, for respondent.

48

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

These cases were argued together and submitted for decision as one case.

The petitioners, hereinafter referred to as defendants, are negroes charged with the crime of rape, committed upon the persons of two white girls. The crime is said to have been committed on March 25, 1931. The indictment was returned in a state court of first instance on March 31, and the record recites that on the same day the defendants were arraigned and entered pleas of not guilty. There is a further recital to the effect that upon the arraignment they were represented by counsel. But no counsel had been employed, and aside from a statement made by the trial judge several days later during a colloquy immediately preceding the trial, the record does not disclose when, or under what circumstances, an appointment of counsel was made, or who was appointed. During the colloquy referred to, the trial judge, in response to a question, said that he had appointed all the members of the bar for the purpose of arraigning the defendants and then of course anticipated that the members of the bar would continue to help the defendants if no counsel appeared. Upon the argument here both sides accepted that as a correct statement of the facts concerning the matter.

There was a severance upon the request of the state, and the defendants were tried in three several groups, as indicated above. As each of the three cases was called for trial, each defendant was arraigned, and, having the

indictment read to him, entered a plea of not guilty. Whether the original arraignment and pleas were regarded as ineffective is not shown. Each of the three trials was completed within a single day. Under the Alabama statute the punishment for rape is to be fixed by the jury, and in its discretion may be from ten years imprisonment to death. The juries found defendants guilty and imposed the death penalty upon all. The trial court overruled motions for new trials and sentenced the defendants in accordance with the verdicts. The judgments were affirmed by the state supreme court. Chief Justice Anderson thought the defendants had not been accorded a fair trial and strongly dissented. 224 Ala. 524; *id.* 531; *id.* 540; 141 So. 215, 195, 201.

In this court the judgments are assailed upon the grounds that the defendants, and each of them, were denied due process of law and the equal protection of the laws, in contravention of the Fourteenth Amendment, specifically as follows: (1) they were not given a fair, impartial and deliberate trial; (2) they were denied the right of counsel, with the accustomed incidents of consultation and opportunity of preparation for trial; and (3) they were tried before juries from which qualified members of their own race were systematically excluded. These questions were properly raised and saved in the courts below.

The only one of the assignments which we shall consider is the second, in respect of the denial of counsel; and it becomes unnecessary to discuss the facts of the case or the circumstances surrounding the prosecution except in so far as they reflect light upon that question.

The record shows that on the day when the offense is said to have been committed, these defendants, together with a number of other negroes, were upon a freight train on its way through Alabama. On the same train were seven white boys and the two white girls. A fight took

place between the negroes and the white boys, in the course of which the white boys, with the exception of one named Gilley, were thrown off the train. A message was sent ahead, reporting the fight and asking that every negro be gotten off the train. The participants in the fight, and the two girls, were in an open gondola car. The two girls testified that each of them was assaulted by six different negroes in turn, and they identified the seven defendants as having been among the number. None of the white boys was called to testify, with the exception of Gilley, who was called in rebuttal.

Before the train reached Scottsboro, Alabama, a sheriff's posse seized the defendants and two other negroes. Both girls and the negroes then were taken to Scottsboro, the county seat. Word of their coming and of the alleged assault had preceded them, and they were met at Scottsboro by a large crowd. It does not sufficiently appear that the defendants were seriously threatened with, or that they were actually in danger of, mob violence; but it does appear that the attitude of the community was one of great hostility. The sheriff thought it necessary to call for the militia to assist in safeguarding the prisoners. Chief Justice Anderson pointed out in his opinion that every step taken from the arrest and arraignment to the sentence was accompanied by the military. Soldiers took the defendants to Gadsden for safekeeping, brought them back to Scottsboro for arraignment, returned them to Gadsden for safekeeping while awaiting trial, escorted them to Scottsboro for trial a few days later, and guarded the court house and grounds at every stage of the proceedings. It is perfectly apparent that the proceedings, from beginning to end, took place in an atmosphere of tense, hostile and excited public sentiment. During the entire time, the defendants were closely confined or were under military guard. The record does not disclose their ages, except that one of them was nineteen; but the

record clearly indicates that most, if not all, of them were youthful, and they are constantly referred to as "the boys." They were ignorant and illiterate. All of them were residents of other states, where alone members of their families or friends resided.

However guilty defendants, upon due inquiry, might prove to have been, they were, until convicted, presumed to be innocent. It was the duty of the court having their cases in charge to see that they were denied no necessary incident of a fair trial. With any error of the state court involving alleged contravention of the state statutes or constitution we, of course, have nothing to do. The sole inquiry which we are permitted to make is whether the federal Constitution was contravened (*Rogers* v. *Peck*, 199 U. S. 425, 434; *Hebert* v. *Louisiana*, 272 U. S. 312, 316); and as to that, we confine ourselves, as already suggested, to the inquiry whether the defendants were in substance denied the right of counsel, and if so, whether such denial infringes the due process clause of the Fourteenth Amendment.

*First.* The record shows that immediately upon the return of the indictment defendants were arraigned and pleaded not guilty. Apparently they were not asked whether they had, or were able to employ, counsel, or wished to have counsel appointed; or whether they had friends or relatives who might assist in that regard if communicated with. That it would not have been an idle ceremony to have given the defendants reasonable opportunity to communicate with their families and endeavor to obtain counsel is demonstrated by the fact that, very soon after conviction, able counsel appeared in their behalf. This was pointed out by Chief Justice Anderson in the course of his dissenting opinion. "They were nonresidents," he said, "and had little time or opportunity to get in touch with their families and friends who were scattered throughout two other states, and time has dem-

onstrated that they could or would have been represented by able counsel had a better opportunity been given by a reasonable delay in the trial of the cases, judging from the number and activity of counsel that appeared immediately or shortly after their conviction." 224 Ala., at pp. 554-555; 141 So. 201.

It is hardly necessary to say that, the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice. Not only was that not done here, but such designation of counsel as was attempted was either so indefinite or so close upon the trial as to amount to a denial of effective and substantial aid in that regard. This will be amply demonstrated by a brief review of the record.

April 6, six days after indictment, the trials began. When the first case was called, the court inquired whether the parties were ready for trial. The state's attorney replied that he was ready to proceed. No one answered for the defendants or appeared to represent or defend them. Mr. Roddy, a Tennessee lawyer not a member of the local bar, addressed the court, saying that he had not been employed, but that people who were interested had spoken to him about the case. He was asked by the court whether he intended to appear for the defendants, and answered that he would like to appear along with counsel that the court might appoint. The record then proceeds:

" The Court: If you appear for these defendants, then I will not appoint counsel; if local counsel are willing to appear and assist you under the circumstances all right, but I will not appoint them.

" Mr. Roddy: Your Honor has appointed counsel, is that correct?

" The Court: I appointed all the members of the bar for the purpose of arraigning the defendants and then of course I anticipated them to continue to help them if no counsel appears.

54

" Mr. Roddy: Then I don't appear then as counsel but I do want to stay in and not be ruled out in this case.

" The Court: Of course I would not do that—

" Mr. Roddy: I just appear here through the courtesy of Your Honor.

" The Court: Of course I give you that right; . . ."

And then, apparently addressing all the lawyers present, the court inquired:

" . . . well are you all willing to assist?

" Mr. Moody: Your Honor appointed us all and we have been proceeding along every line we know about it under Your Honor's appointment.

" The Court: The only thing I am trying to do is, if counsel appears for these defendants I don't want to impose on you all, but if you feel like counsel from Chattanooga—

" Mr. Moody: I see his situation of course and I have not run out of anything yet. Of course, if Your Honor purposes to appoint us, Mr. Parks, I am willing to go on with it. Most of the bar have been down and conferred with these defendants in this case; they did not know what else to do.

" The Court: The thing, I did not want to impose on the members of the bar if counsel unqualifiedly appears; if you all feel like Mr. Roddy is only interested in a limited way to assist, then I don't care to appoint—

" Mr. Parks: Your Honor, I don't feel like you ought to impose on any member of the local bar if the defendants are represented by counsel.

" The Court: That is what I was trying to ascertain, Mr. Parks.

" Mr. Parks: Of course if they have counsel, I don't see the necessity of the Court appointing anybody; if they haven't counsel,. of course I think it is up to the Court to appoint counsel to represent them.

" The Court: I think you are right about it Mr. Parks and that is the reason I was trying to get an expression from Mr. Roddy.

" Mr. Roddy: I think Mr. Parks is entirely right about it, if I was paid down here and employed, it would be a different thing, but I have not prepared this case for trial and have only been called into it by people who are interested in these boys from Chattanooga. Now, they have not given me an opportunity to prepare the case and I am not familiar with the procedure in Alabama, but I merely came down here as a friend of the people who are interested and not as paid counsel, and certainly I haven't any money to pay them and nobody I am interested in had me to come down here has put up any fund of money to come down here and pay counsel. If they should do it I would be glad to turn it over—a counsel but I am merely here at the solicitation of people who have become interested in this case without any payment of fee and without any preparation for trial and I think the boys would be better off if I step entirely out of the case according to my way of looking at it and according to my lack of preparation of it and not being familiar with the procedure in Alabama, . . ."

Mr. Roddy later observed:

" If there is anything I can do to be of help to them, I will be glad to do it; I am interested to that extent.

" The Court: Well gentlemen, if Mr. Roddy only appears as assistant that way, I think it is proper that I appoint members of this bar to represent them, I expect that is right. If Mr. Roddy will appear, I wouldn't of course, I would not appoint anybody. I don't see, Mr. Roddy, how I can make a qualified appointment or a limited appointment. Of course, I don't mean to cut off your assistance in any way—Well gentlemen, I think you understand it.

" Mr. Moody: I am willing to go ahead and help Mr. Roddy in anything I can do about it, under the circumstances.

" The Court: All right, all the lawyers that will; of course I would not require a lawyer to appear if—

" Mr. Moody: I am willing to do that for him as a member of the bar; I will go ahead and help do anything I can do.

" The Court: All right."

And in this casual fashion the matter of counsel in a capital case was disposed of.

It thus will be seen that until the very morning of the trial no lawyer had been named or definitely designated to represent the defendants. Prior to that time, the trial judge had " appointed all the members of the bar " for the limited " purpose of arraigning the defendants." Whether they would represent the defendants thereafter if no counsel appeared in their behalf, was a matter of speculation only, or, as the judge indicated, of mere anticipation on the part of the court. Such a designation, even if made for all purposes, would, in our opinion, have fallen far short of meeting, in any proper sense, a requirement for the appointment of counsel. How many lawyers were members of the bar does not appear; but, in the very nature of things, whether many or few, they would not, thus collectively named, have been given that clear appreciation of responsibility or impressed with that individual sense of duty which should and naturally would accompany the appointment of a selected member of the bar, specifically named and assigned.

That this action of the trial judge in respect of appointment of counsel was little more than an expansive gesture, imposing no substantial or definite obligation upon any one, is borne out by the fact that prior to the calling of the case for trial on April 6, a leading member of the local bar accepted employment on the side of the prosecution

and actively participated in the trial. It is true that he said that before doing so he had understood Mr. Roddy would be employed as counsel for the defendants. This the lawyer in question, of his own accord, frankly stated to the court; and no doubt he acted with the utmost good faith. Probably other members of the bar had a like understanding. In any event, the circumstance lends emphasis to the conclusion that during perhaps the most critical period of the proceedings against these defendants, that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation were vitally important, the defendants did not have the aid of counsel in any real sense, although they were as much entitled to such aid during that period as at the trial itself. *People ex rel. Burgess* v. *Risley,* 66 How. Pr. (N. Y.) 67; *Batchelor* v. *State,* 189 Ind. 69, 76; 125 N. E. 773.

Nor do we think the situation was helped by what occurred on the morning of the trial. At that time, as appears from the colloquy printed above, Mr. Roddy stated to the court that he did not appear as counsel, but that he would like to appear along with counsel that the court might appoint; that he had not been given an opportunity to prepare the case; that he was not familiar with the procedure in Alabama, but merely came down as a friend of the people who were interested; that he thought the boys would be better off if he should step entirely out of the case. Mr. Moody, a member of the local bar, expressed a willingness to help Mr. Roddy in anything he could do under the circumstances. To this the court responded, "All right, all the lawyers that will; of course I would not require a lawyer to appear if—." And Mr. Moody continued, " I am willing to do that for him as a member of the bar; I will go ahead and help do any thing I can do." With this dubious understanding, the trials immediately proceeded. The defendants, young, igno-

rant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for the first time charged with any degree of responsibility began to represent them.

It is not enough to assume that counsel thus precipitated into the case thought there was no defense, and exercised their best judgment in proceeding to trial without preparation. Neither they nor the court could say what a prompt and thoroughgoing investigation might disclose as to the facts. No attempt was made to investigate. No opportunity to do so was given. Defendants were immediately hurried to trial. Chief Justice Anderson, after disclaiming any intention to criticize harshly counsel who attempted to represent defendants at the trials, said: " . . . the record indicates that the appearance was rather *pro forma* than zealous and active . . ." Under the circumstances disclosed, we hold that defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply be to ignore actualities. This conclusion finds ample support in the reasoning of an overwhelming array of state decisions, among which we cite the following: *Sheppard* v. *State,* 165 Ga. 460, 464; 141 S. E. 196; *Reliford* v. *State,* 140 Ga. 777; 79 S. E. 1128; *McArver* v. *State,* 114 Ga. 514; 40 S. E. 779; *Sanchez* v. *State,* 199 Ind. 235, 246; 157 N. E. 1; *Batchelor* v. *State,* 189 Ind. 69, 76; 125 N. E. 773; *Mitchell* v. *Commonwealth,* 225 Ky. 83; 7 S. W. (2d) 823; *Jackson* v. *Commonwealth,* 215 Ky. 800; 287 S. W. 17; *State* v. *Collins,* 104 La. 629; 29 So. 180; *State* v. *Pool,* 50 La. Ann. 449; 23 So. 503; *People ex rel. Burgess* v. *Risley,* 66 How. Pr. (N. Y.) 67; *State ex rel. Tucker* v. *Davis,* 9 Okla. Cr. 94; 130 Pac. 962; *Commonwealth* v. *O'Keefe,* 298 Pa. 169;

148 Atl. 73; *Shaffer* v. *Territory*, 14 Ariz. 329, 333; 127 Pac. 746.

It is true that great and inexcusable delay in the enforcement of our criminal law is one of the grave evils of our time. Continuances are frequently granted for unnecessarily long periods of time, and delays incident to the disposition of motions for new trial and hearings upon appeal have come in many cases to be a distinct reproach to the administration of justice. The prompt disposition of criminal cases is to be commended and encouraged. But in reaching that result a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense. To do that is not to proceed promptly in the calm spirit of regulated justice but to go forward with the haste of the mob.

As the court said in *Commonwealth* v. *O'Keefe*, 298 Pa. 169, 173; 148 Atl. 73:

" It is vain to give the accused a day in court, with no opportunity to prepare for it, or to guarantee him counsel without giving the latter any opportunity to acquaint himself with the facts or law of the case.

. . . . . . .

"A prompt and vigorous administration of the criminal law is commendable and we have no desire to clog the wheels of justice. What we here decide is that to force a defendant, charged with a serious misdemeanor, to trial within five hours of his arrest, is not due process of law, regardless of the merits of the case."

Compare *Reliford* v. *State*, 140 Ga. 777, 778; 79 S. E. 1128.

*Second*. The Constitution of Alabama provides that in all criminal prosecutions the accused shall enjoy the right to have the assistance of counsel; and a state statute requires the court in a capital case, where the defendant

is unable to employ counsel, to appoint counsel for him. The state supreme court held that these provisions had not been infringed, and with that holding we are powerless to interfere. The question, however, which it is our duty, and within our power, to decide, is whether the denial of the assistance of counsel contravenes the due process clause of the Fourteenth Amendment to the federal Constitution.

If recognition of the right of a defendant charged with a felony to have the aid of counsel depended upon the existence of a similar right at common law as it existed in England when our Constitution was adopted, there would be great difficulty in maintaining it as necessary to due process. Originally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest. At the same time parties in civil cases and persons accused of misdemeanors were entitled to the full assistance of counsel. After the revolution of 1688, the rule was abolished as to treason, but was otherwise steadily adhered to until 1836, when by act of Parliament the full right was granted in respect of felonies generally. 1 Cooley's Const. Lim., 8th ed., 698, *et seq.*, and notes.

An affirmation of the right to the aid of counsel in petty offenses, and its denial in the case of crimes of the gravest character, where such aid is most needed, is so outrageous and so obviously a perversion of all sense of proportion that the rule was constantly, vigorously and sometimes passionately assailed by English statesmen and lawyers. As early as 1758, Blackstone, although recognizing that the rule was settled at common law, denounced it as not in keeping with the rest of the humane treatment of prisoners by the English law. " For upon what face of reason," he says, " can that assistance be denied

to save the life of a man, which yet is allowed him in prosecutions for every petty trespass? " 4 Blackstone 355. One of the grounds upon which Lord Coke defended the rule was that in felonies the court itself was counsel for the prisoner. 1 Cooley's Const. Lim., *supra.* But how can a judge, whose functions are purely judicial, effectively discharge the obligations of counsel for the accused? He can and should see to it that in the proceedings before the court the accused shall be dealt with justly and fairly. He cannot investigate the facts, advise and direct the defense, or participate in those necessary conferences between counsel and accused which sometimes partake of the inviolable character of the confessional.

. The rule was rejected by the colonies. Before the adoption of the federal Constitution, the Constitution of Maryland had declared " That, in all criminal prosecutions, every man hath a right . . . to be allowed counsel; . . ." (Art. XIX, Constitution of 1776). The Constitution of Massachusetts, adopted in 1780 (Part the First, Art. XII), the Constitution of New Hampshire, adopted in 1784 (Part I, Art. XV), the Constitution of New York of 1777 (Art. XXXIV), and the Constitution of Pennsylvania of 1776 (Art. IX), had also declared to the same effect. And in the case of Pennsylvania, as early as 1701, the Penn Charter (Art. V) declared that " all Criminals shall have the same Privileges of Witnesses and Council as their Prosecutors "; and there was also a provision in the Pennsylvania statute of May 31, 1718 (Dallas, Laws of Pennsylvania, 1700–1781, Vol. 1, p. 134), that in capital cases learned counsel should be assigned to the prisoners.

In Delaware, the Constitution of 1776 (Art. 25), adopted the common law of England, but expressly excepted such parts as were repugnant to the rights and privileges contained in the Declaration of Rights; and the Declaration of Rights, which was adopted on September

11, 1776, provided (Art. 14), "That in all Prosecutions for criminal Offences, every Man hath a Right . . . to be allowed Counsel, . . ." In addition, Penn's Charter, already referred to, was applicable in Delaware. The original Constitution of New Jersey of 1776 (Art. XVI) contained a provision like that of the Penn Charter, to the effect that all criminals should be admitted to the same privileges of counsel as their prosecutors. The original Constitution of North Carolina (1776) did not contain the guarantee, but c. 115, § 85, Sess. Laws, N. Car., 1777 (N. Car. Rev. Laws, 1715–1796, Vol. 1, 316), provided ". . . That every person accused of any crime or misdemeanor whatsoever, shall be entitled to council in all matters which may be necessary for his defence, as well to facts as to law; . . ." Similarly, in South Carolina the original Constitution of 1776 did not contain the provision as to counsel, but it was provided as early as 1731 (Act of August 20, 1731, § XLIII, Grimke, S. Car. Pub. Laws, 1682–1790, p. 130) that every person charged with treason, murder, felony, or other capital offense, should be admitted to make full defense by counsel learned in the law. In Virginia there was no constitutional provision on the subject, but as early as August, 1734 (c. VII, .§ III, Laws of Va., 8th Geo. II, Hening's Stat. at Large, Vol. 4, p. 404), there was an act declaring that in all trials for capital offenses the prisoner, upon his petition to the court, should be allowed counsel.

The original Constitution of Connecticut (Art. I, § 9) contained a provision that "In all criminal prosecutions, the accused shall have the right to be heard by himself and by counsel"; but this constitution was not adopted until 1818. However, it appears that the English common law rule had been rejected in practice long prior to 1796. See Zephaniah Swift's "A System of the Laws of the State of Connecticut," printed at Windham by John

Byrne, 1795–1796, Vol. II, Bk. 5, " Of Crimes and Punishments," c. XXIV, " Of Trials," pp. 398–399.*

The original Constitution of Georgia (1777) did not contain a guarantee in respect of counsel, but the Constitution of 1798 (Art. III, § 8) provided that " . . . no person shall be debarred from advocating or defending his cause before any court or tribunal, either by himself or counsel, or both." What the practice was prior to 1798 we are unable to discover. The first constitution adopted by Rhode Island was in 1842, and this constitution contained the usual guarantee in respect of the assistance of counsel in criminal prosecutions. As early as 1798 it was provided by statute, in the very language of the Sixth Amendment to the Federal Constitution, that " In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defence;

* This ancient work, consisting of six books, has long been out of print. A copy of it is preserved in the locked files of the Library of Congress. The following extract from the pages cited is both interesting and instructive:

" The attorney for the state then proceeds to lay before the jury, all the evidence against the prisoner, without any remarks or arguments. The prisoner by himself or counsel, is then allowed to produce witnesses to counteract and obviate the testimony against him; and to exculpate himself with the same freedom as in civil cases. We have never admitted that cruel and illiberal principle of the common law of England that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence, which are allowed, when the most trifling pittance of property is in question. The flimsy pretence, that the court are to be counsel for the prisoner will only highten our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defence. This doctrine might with propriety have been advanced, at the time when by the common law of England, no witnesses could be adduced on the part of the prisoner, to manifest his innocence, for he could then make no preparation for his defense. One cannot read without horror and astonishment, the abominable maxims of law, which de-

. . ." An Act Declaratory of certain Rights of the People of this State, § 6, Rev. Pub. Laws, Rhode Island and Providence Plantations, 1798. Furthermore, while the statute itself is not available, it is recorded as a matter of history that in 1668 or 1669 the colonial assembly enacted that any person who was indicted might employ an attorney to plead in his behalf. 1 Arnold, History of Rhode Island, 336.

It thus appears that in at least twelve of the thirteen colonies the rule of the English common law, in the respect now under consideration, had been definitely rejected and the right to counsel fully recognized in all

---

prived persons accused, and on trial for crimes, of the assistance of counsel, except as to points of law, and the advantage of witnesses to exculpate themselves from the charge. It seems by the ancient practice, that whenever a person was accused of a crime, every expedient was adopted to convict him and every privilege denied him, to prove his innocence. In England, however, as the law now stands, prisoners are allowed the full advantage of witnesses, but excepting in a few cases, the common law is enforced, in denying them counsel, except as to points of law.

" Our ancestors, when they first enacted their laws respecting crimes, influenced by the illiberal principles which they had imbibed in their native country, denied counsel to prisoners to plead for them to anything but points of law. It is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered.

" The legislature has become so thoroughly convinced of the impropriety and injustice of shackling and restricting a prisoner with respect to his defence, that they have abolished all those odious laws, and every person when he is accused of a crime, is entitled to every possible privilege in making his defence, and manifesting his innocence, by the instrumentality of counsel, and the testimony of witnesses."

The early statutes of Connecticut, upon examination, do not seem to be as clear as this last paragraph would indicate; but Mr. Swift, writing in 1796, was in a better position to know how the statutes had been interpreted and applied in actual practice than the reader of today; and we see no reason to reject his statement.

criminal prosecutions, save that in one or two instances the right was limited to capital offenses or to the more serious crimes; and this court seems to have been of the opinion that this was true in all the colonies. In *Holden* v. *Hardy,* 169 U. S. 366, 386, Mr. Justice Brown, writing for the court, said:

" The earlier practice of the common law, which denied the benefit of witnesses to a person accused of felony, had been abolished by statute, though so far as it deprived him of the assistance of counsel and compulsory process for the attendance of his witnesses, it had not been changed in England. But to the credit of her American colonies, let it be said that so oppressive a doctrine had never obtained a foothold there."

One test which has been applied to determine whether due process of law has been accorded in given instances is to ascertain what were the settled usages and modes of proceeding under the common and statute law of England before the Declaration of Independence, subject, however, to the qualification that they be shown not to have been unsuited to the civil and political conditions of our ancestors by having been followed in this country after it became a nation. *Lowe* v. *Kansas,* 163 U. S. 81, 85. Compare *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 276–277; *Twining* v. *New Jersey,* 211 U. S. 78, 100–101. Plainly, as appears from the foregoing, this test, as thus qualified, has not been met in the present case.

We do not overlook the case of *Hurtado* v. *California,* 110 U. S. 516, where this court determined that due process of law does not require an indictment by a grand jury as a prerequisite to prosecution by a state for murder. In support of that conclusion the court (pp. 534–535) referred to the fact that the Fifth Amendment, in addition to containing the due process of law clause, pro-

vides in explicit terms that " No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury, . . .", and said that since no part of this important amendment could be regarded as superfluous, the obvious inference is that in the sense of the Constitution due process of law was not intended to include, *ex vi termini*, the institution and procedure of a grand jury in any case; and that the same phrase, employed in the Fourteenth Amendment to restrain the action of the states, was to be interpreted as having been used in the same sense and with no greater extent; and that if it had been the purpose of that Amendment to perpetuate the institution of the grand jury in the states, it would have embodied, as did the Fifth Amendment, an express declaration to that effect.

The Sixth Amendment, in terms, provides that in all criminal prosecutions the accused shall enjoy the right " to have the assistance of counsel for his defense." In the face of the reasoning of the *Hurtado* case, if it stood alone, it would be difficult to justify the conclusion that the right to counsel, being thus specifically granted by the Sixth Amendment, was also within the intendment of the due process of law clause. But the *Hurtado* case does not stand alone. In the later case of *Chicago, Burlington & Quincy R. Co.* v. *Chicago*, 166 U. S. 226, 241, this court held that a judgment of a state court, even though authorized by statute, by which private property was taken for public use without just compensation, was in violation of the due process of law required by the Fourteenth Amendment, notwithstanding that the Fifth Amendment explicitly declares that private property shall not be taken for public use without just compensation. This holding was followed in *Norwood* v. *Baker*, 172 U. S. 269, 277; *Smyth* v. *Ames*, 169 U. S. 466, 524; and *San Diego Land Co.* v. *National City*, 174 U. S. 739, 754.

Likewise, this court has considered that freedom of speech and of the press are rights protected by the due process clause of the Fourteenth Amendment, although in the First Amendment, Congress is prohibited in specific terms from abridging the right. *Gitlow* v. *New York,* 268 U. S. 652, 666; *Stromberg* v. *California,* 283 U. S. 359, 368; *Near* v. *Minnesota,* 283 U. S. 697, 707.

These later cases establish that notwithstanding the sweeping character of the language in the *Hurtado* case, the rule laid down is not without exceptions. The rule is an aid to construction, and in some instances may be conclusive; but it must yield to more compelling considerations whenever such considerations exist. The fact that the right involved is of such a character that it cannot be denied without violating those " fundamental principles of liberty and justice which lie at the base of all our civil and political institutions " (*Hebert* v. *Louisiana,* 272 U. S. 312, 316), is obviously one of those compelling considerations which must prevail in determining whether it is embraced within the due process clause of the Fourteenth Amendment, although it be specifically dealt with in another part of the federal Constitution. Evidently this court, in the later cases enumerated, regarded the rights there under consideration as of this fundamental character. That some such distinction must be observed is foreshadowed in *Twining* v. *New Jersey,* 211 U. S. 78, 99, where Mr. Justice Moody, speaking for the court, said that " . . . it is possible that some of the personal rights safeguarded by the first eight Amendments against National action may also be safeguarded against state action, because a denial of them would be a denial of due process of law. *Chicago, Burlington & Quincy R. Co.* v. *Chicago,* 166 U. S. 226. If this is so, it is not because those rights are enumerated in the first eight Amendments, but because they are of such a nature that they are included in

the conception of due process of law." While the question has never been categorically determined by this court, a consideration of the nature of the right and a review of the expressions of this and other courts, makes it clear that the right to the aid of counsel is of this fundamental character.

It never has been doubted by this court, or any other so far as we know, that notice and hearing are preliminary steps essential to the passing of an enforceable judgment, and that they, together with a legally competent tribunal having jurisdiction of the case, constitute basic elements of the constitutional requirement of due process of law. The words of Webster, so often quoted, that by " the law of the land " is intended " a law which hears before it condemns," have been repeated in varying forms of expression in a multitude of decisions. In *Holden* v. *Hardy,* 169 U. S. 366, 389, the necessity of due notice and an opportunity of being heard is described as among the " immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." And Mr. Justice Field, in an earlier case, *Galpin* v. *Page,* 18 Wall. 350, 368–369, said that the rule that no one shall be personally bound until he has had his day in court was as old as the law, and it meant that he must be cited to appear and afforded an opportunity to be heard. " Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and never can be upheld where justice is justly administered." Citations to the same effect might be indefinitely multiplied, but there is no occasion for doing so.

What, then, does a hearing include? Historically and in practice, in our own country at least, it has always included the right to the aid of counsel when desired and provided by the party asserting the right. The right

to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

The decisions all point to that conclusion. In *Cooke* v. *United States,* 267 U. S. 517, 537, it was held that where a contempt was not in open court, due process of law required charges and a reasonable opportunity to defend or explain. The court added, " We think this includes the assistance of counsel, if requested, . . ." In numerous other cases the court, in determining that due process was accorded, has frequently stressed the fact that the defendant had the aid of counsel. See, for example, *Felts* v. *Murphy,* 201 U. S. 123, 129; *Frank* v. *Mangum,* 237 U. S. 309, 344; *Kelley* v. *Oregon,* 273 U. S. 589, 591. In *Ex parte Hidekuni Iwata,* 219 Fed. 610, 611, the federal dis-

trict judge enumerated among the elements necessary to due process of law in a deportation case the opportunity at some stage of the hearing to secure and have the advice and assistance of counsel. In *Ex parte Chin Loy You,* 223 Fed. 833, also a deportation case, the district judge held that under the particular circumstances of the case the prisoner, having seasonably made demand, was entitled to confer with and have the aid of counsel. Pointing to the fact that the right to counsel as secured by the Sixth Amendment relates only to criminal prosecutions, the judge said, " . . . but it is equally true that that provision was inserted in the Constitution because the assistance of counsel was recognized as essential to any fair trial of a case against a prisoner." In *Ex parte Riggins,* 134 Fed. 404, 418, a case involving the due process clause of the Fourteenth Amendment, the court said, by way of illustration, that if the state should deprive a person of the benefit of counsel, it would not be due process of law. Judge Cooley refers to the right of a person accused of crime to have counsel as perhaps his most important privilege, and after discussing the development of the English law upon that subject, says: " With us it is a universal principle of constitutional law, that the prisoner shall be allowed a defense by counsel." 1 Cooley's Const. Lim., 8th ed., 700. The same author, as appears from a chapter which he added to his edition of Story on the Constitution, regarded the right of the accused to the presence, advice and assistance of counsel as necessarily included in due process of law. 2 Story on the Constitution, 4th ed., § 1949, p. 668. The state decisions which refer to the matter, invariably recognize the right to the aid of counsel as fundamental in character. E. g., *People* v. *Napthaly,* 105 Cal. 641, 644; 39 Pac. 29; *Cutts* v. *State,* 54 Fla. 21, 23; 45 So. 491; *Martin* v. *State,* 51 Ga. 567, 568; *Sheppard* v. *State,* 165 Ga. 460, 464; 141 S. E. 196; *State* v. *Moore,* 61 Kan. 732, 734; 60 Pac. 748;

*State* v. *Ferris*, 16 La. Ann. 424; *State* v. *Simpson*, 38 La. Ann. 23, 24; *State* v. *Briggs*, 58 W. Va. 291, 292; 52 S. E. 218.

In the light of the facts outlined in the forepart of this opinion—the ignorance and illiteracy of the defendants, their youth, the circumstances of public hostility, the imprisonment and the close surveillance of the defendants by the military forces, the fact that their friends and families were all in other states and communication with them necessarily difficult, and above all that they stood in deadly peril of their lives—we think the failure of the trial court to give them reasonable time and opportunity to secure counsel was a clear denial of due process.

But passing that, and assuming their inability, even if opportunity had been given, to employ counsel, as the trial court evidently did assume, we are of opinion that, under the circumstances just stated, the necessity of counsel was so vital and imperative that the failure of the trial court to make an effective appointment of counsel was likewise a denial of due process within the meaning of the Fourteenth Amendment. Whether this would be so in other criminal prosecutions, or under other circumstances, we need not determine. All that it is necessary now to decide, as we do decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case. To hold otherwise would be to ignore the fundamental postulate, already adverted to, "that there are certain immutable principles of justice which inhere in the very idea of free government which

no member of the Union may disregard." *Holden* v. *Hardy, supra.* In a case such as this, whatever may be the rule in other cases, the right to have counsel appointed, when necessary, is a logical corollary from the constitutional right to be heard by counsel. Compare *Carpenter & Sprague* v. *Dane County,* 9 Wis. 274; *Dane County* v. *Smith,* 13 Wis. 585, 586. *Hendryx* v. *State,* 130 Ind. 265, 268–269; 29 N. E. 1131; *Cutts* v. *State,* 54 Fla. 21, 23; 45 So. 491; *People* v. *Goldenson,* 76 Cal. 328, 344; 19 Pac. 161; *Delk* v. *State,* 99 Ga. 667, 669–670; 26 S. E. 752.

In *Hendryx* v. *State, supra,* there was no statute authorizing the assignment of an attorney to defend an indigent person accused of crime, but the court held that such an assignment was necessary to accomplish the ends of public justice, and that the court possessed the inherent power to make it. " Where a prisoner," the court said (p. 269), "without legal knowledge, is confined in jail, absent from his friends, without the aid of legal advice or the means of investigating the charge against him, it is impossible to conceive of a fair trial where he is compelled to conduct his cause in court, without the aid of counsel. . . . Such a trial is not far removed from an *ex parte* proceeding."

Let us suppose the extreme case of a prisoner charged with a capital offense, who is deaf and dumb, illiterate and feeble minded, unable to employ counsel, with the whole power of the state arrayed against him, prosecuted by counsel for the state without assignment of counsel for his defense, tried, convicted and sentenced to death. Such a result, which, if carried into execution, would be little short of judicial murder, it cannot be doubted would be a gross violation of the guarantee of due process of law; and we venture to think that no appellate court, state or federal, would hesitate so to decide. See *Stephenson* v. *State,* 4 Ohio App. 128; *Williams* v. *State,* 163 Ark. 623,

628; 260 S. W. 721; *Grogan v. Commonwealth*, 222 Ky. 484, 485; 1 S. W. (2d) 779; *Mullen v. State*, 28 Okla. Cr. 218, 230; 230 Pac. 285; *Williams v. Commonwealth*, (Ky.), 110 S. W. 339, 340. The duty of the trial court to appoint counsel under such circumstances is clear, as it is clear under circumstances such as are disclosed by the record here; and its power to do so, even in the absence of a statute, can not be questioned. Attorneys are officers of the court, and are bound to render service when required by such an appointment. See Cooley, Const. Lim., *supra*, 700 and note.

The United States by statute and every state in the Union by express provision of law, or by the determination of its courts, make it the duty of the trial judge, where the accused is unable to employ counsel, to appoint counsel for him. In most states the rule applies broadly to all criminal prosecutions, in others it is limited to the more serious crimes, and in a very limited number, to capital cases. A rule adopted with such unanimous accord reflects, if it does not establish, the inherent right to have counsel appointed, at least in cases like the present, and lends convincing support to the conclusion we have reached as to the fundamental nature of that right.

The judgments must be reversed and the causes remanded for further proceedings not inconsistent with this opinion.

*Judgments reversed.*

Mr. Justice Butler, dissenting.

The Court, putting aside—they are utterly without merit—all other claims that the constitutional rights of petitioners were infringed, grounds its opinion and judgment upon a single assertion of fact. It is that petitioners " were denied the right of counsel, with the accustomed incidents of consultation and opportunity of preparation for trial." If that is true, they were denied due process

of law and are entitled to have the judgments against them reversed.

But no such denial is shown by the record.

Nine defendants including Patterson were accused in one indictment, and he was also separately indicted. Instead of trying them *en masse,* the State gave four trials and so lessened the danger of mistake and injustice that inevitably attends an attempt in a single trial to ascertain the guilt or innocence of many accused. Weems and Norris were tried first. Patterson was tried next on the separate indictment. Then five were tried. These eight were found guilty. The other defendant, Roy Wright, was tried last and not convicted. The convicted defendants took the three cases to the state supreme court where the judgment as to Williams was reversed and those against the seven petitioners were affirmed.

There were three painstaking opinions, a different justice writing for the court in each case. 224 Ala. 524, 531, 540; 141 So. 215, 195, 201. Many of the numerous questions decided were raised at the trial and reflect upon defendants' counsel much credit for zeal and diligence on behalf of their clients. Seven justices heard the cases. The chief justice, alone dissenting, did not find any contention for the accused sufficient in itself to warrant a reversal but alluded to a number of considerations which he deemed sufficient when taken together to warrant the conclusion that the defendants did not have a fair trial. The court said (p. 553): "We think it a bit inaccurate to say Mr. Roddy appeared only as *amicus curiae.* [This refers to a remark in the dissenting opinion.] He expressly announced he was there from the beginning at the instance of friends of the accused; but not being paid counsel asked to appear not as employed counsel, but to aid local counsel appointed by the court, and was permitted so to appear. The defendants were represented as shown by the record and pursuant to appointment of the

court by Hon. Milo Moody, an able member of the local
bar of long and successful experience in the trial of crimi-
nal as well as civil cases. We do not regard the repre-
sentation of the accused by counsel as *pro forma*. A very
rigorous and rigid cross-examination was made of the
state's witnesses, the alleged victims of rape, especially in
the cases first tried. A reading of the records discloses why
experienced counsel would not travel over all the same
ground in each case."

The informality disclosed by the colloquy between court
and counsel, which is quoted in the opinion of this Court
and so heavily leaned on, is not entitled to any weight.
It must be inferred from the record that Mr. Roddy at
all times was in touch with the defendants and the people
who procured him to act for them. Mr. Moody and
others of the local bar also acted for defendants at the
time of the first arraignment and, as appears from the
part of the record that is quoted in the opinion, thereafter
proceeded in the discharge of their duty, including con-
ferences with the defendants. There is not the slightest
ground to suppose that Roddy or Moody were by fear
or in any manner restrained from full performance of
their duties. Indeed, it clearly appears that the State,
by proper and adequate show of its purpose and power
to preserve order, furnished adequate protection to them
and the defendants.

When the first case was called for trial, defendants' at-
torneys had already prepared, and then submitted, a mo-
tion for change of venue together with supporting papers.
They were ready to and did at once introduce testimony
of witnesses to sustain that demand. They had procured
and were ready to offer evidence to show that the de-
fendants Roy Wright and Eugene Williams were under
age. The record shows that the State's evidence was
ample to warrant a conviction. And three defendants
each, while asserting his own innocence, testified that he

saw others accused commit the crime charged. When regard is had to these and other disclosures that may have been and probably were made by petitioners to Roddy and Moody before the trial, it would be difficult to think of anything that counsel erroneously did or omitted for their defense.

If there had been any lack of opportunity for preparation, trial counsel would have applied to the court for postponement. No such application was made. There was no suggestion, at the trial or in the motion for a new trial which they made, that Mr. Roddy or Mr. Moody was denied such opportunity or that they were not in fact fully prepared. The amended motion for new trial, by counsel who succeeded them, contains the first suggestion that defendants were denied counsel or opportunity to prepare for trial. But neither Mr. Roddy nor Mr. Moody has given any support to that claim. Their silence requires a finding that the claim is groundless, for if it had any merit they would be bound to support it. And no one has come to suggest any lack of zeal or good faith on their part.

If correct, the ruling that the failure of the trial court to give petitioners time and opportunity to secure counsel was denial of due process is enough, and with this the opinion should end. But the Court goes on to declare that " the failure of the trial court to make an effective appointment of counsel was likewise a denial of due process within the meaning of the Fourteenth Amendment." This is an extension of federal authority into a field hitherto occupied exclusively by the several States. Nothing before the Court calls for a consideration of the point. It was not suggested below, and petitioners do not ask for its decision here. The Court, without being called upon to consider it, adjudges without a hearing an important constitutional question concerning criminal procedure in state courts.

It is a wise rule, firmly established by a long course of decisions here, that constitutional questions—even when properly raised and argued—are to be decided only when necessary for a determination of the rights of the parties in controversy before it. Thus, in the *Charles River Bridge case,* 11 Pet. 420, the Court said (p. 553): "Many other questions, of the deepest importance, have been raised and elaborately discussed in the argument. It is not necessary, for the decision of this case, to express our opinion upon them; and the Court deem it proper to avoid volunteering an opinion on any question involving the construction of the constitution where the case itself does not bring the question directly before them, and make it their duty to decide upon it." And see *Davidson* v. *New Orleans,* 96 U. S. 97, 103, *et seq. Hauenstein* v. *Lynham,* 100 U. S. 483, 490. *Blair* v. *United States,* 250 U. S. 273, 279. *Adkins* v. *Children's Hospital,* 261 U. S. 525, 544.

The record wholly fails to reveal that petitioners have been deprived of any right guaranteed by the Federal Constitution, and I am of opinion that the judgment should be affirmed.

MR. JUSTICE McREYNOLDS concurs in this opinion.