**UNITED STATES ex rel. Benjamin REID, Petitioner**

v.

**Mark S. RICHMOND, Warden, Connecticut State Prison, Respondent.**

**Civ. A. No. 7845.**

United States District Court
D. Connecticut.

July 14, 1960.

William D. Graham, Hartford, Conn. (appointed counsel), for petitioner.

John D. LaBelle, State's Atty. for Hartford County, Manchester, Conn., J. Read Murphy, Asst. State's Atty. for Hartford County, Hartford, Conn., for respondent.

J. JOSEPH SMITH, District Judge.

The order of this court discharging a writ of habeas corpus brought on behalf of Benjamin Reid, under sentence of death on conviction on June 27, 1957 in the Connecticut courts of murder in the first degree, has been reversed by the United States Court of Appeals for the Second Circuit and the case remanded on April 20, 1960 for consideration, on the entire state court transcript, of two of Reid's contentions. 277 F.2d 702. The transcript was not offered in evidence, nor its production required by the court, at the first hearing. One of Reid's contentions is that he was forced to trial with counsel he did not want, the second, that there was a prejudicial delay in the assignment of counsel to him. On the first issue, the record shows that Reid declined to cooperate fully with the Public Defender, assigned to represent him, making the claim that he was entitled to choose particular counsel who must then be retained by the state. It does not reveal any other basis for his attempted rejection of Mr. Cosgrove than his belief that the state had a duty to provide counsel chosen by him in a capital case. He was twice brought before the court and advised as to his right to employ any counsel willing to represent him, but that the court would name the Public Defender if he was unable to hire counsel. Since Reid was indigent, he did not obtain counsel and the court appointed the Public Defender and, as an assistant public defender, Attorney Graham, to represent him. There appears no lack of due process in the court's refusal to appoint any particular member of the bar, so long as competent counsel were provided. There remains the question of whether due process was lacking because of delay in the appointment of counsel.

The timeliness of an appointment in order to carry out the constitutional requirement of the accused's right to counsel for his defense depends upon the circumstances of the particular case. Reece v. State of Georgia, 350 U.S. 85, 90, 76 S.Ct. 167, 100 L.Ed. 77; Powell v.

State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 77 L.Ed. 158. Even in a capital case, appointment of counsel for the preliminary stages has not been required where an intelligent, 31 year old college graduate with a year of law school training, was involved, Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (four justices dissenting), although even for an experienced lawyer the provision of counsel for the actual trial, if desired, is a requirement. Cf. Glasser v. United States, 315 U.S. 60, 70, 62 S.Ct. 457, 86 L.Ed. 680. Subsequent to the decision of this court on the original hearing, the Supreme Court in Spano v. People of State of New York, 360 U.S. 315, 79 S.Ct. 1202, 1209, 3 L.Ed. 2d 1256, upset a state court murder conviction based on confessions obtained under police questioning following indictment where access to counsel was refused. It would appear from the concurring opinion of Mr. Justice Stewart that the majority of the Court now requires the effective assistance of counsel in a capital case from the time an accusation of murder is made.

"While I concur in the opinion of the Court, it is my view that the absence of counsel when this confession was elicited was alone enough to render it inadmissible under the Fourteenth Amendment.

"Let it be emphasized at the outset that this is not a case where the police were questioning a suspect in the course of investigating an unsolved crime. See Crooker v. [State of] California, 357 U.S. 433 [78 S. Ct. 1287, 2 L.Ed.2d 1448]; Cicenia v. La Gay, 357 U.S. 504 [78 S.Ct. 1297, 2 L.Ed.2d 1523]. When the petitioner surrendered to the New York authorities he was under indictment for first degree murder.

"Under our system of justice an indictment is supposed to be followed by an arraignment and a trial. At every stage in those proceedings the accused has an absolute right to a lawyer's help if the case is one in which a death sentence may be im-

posed. Powell v. [State of] Alabama, 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158]. Indeed the right to the assistance of counsel whom the accused has himself retained is absolute, whatever the offense for which he is on trial. Chandler v. Fretag, 348 U.S. 3 [75 S.Ct. 1, 99 L. Ed. 4].

"What followed the petitioner's surrender in this case was not arraignment in a court of law, but an all-night inquisition in a prosecutor's office, a police station, and an automobile. Throughout the night the petitioner repeatedly asked to be allowed to send for his lawyer, and his requests were repeatedly denied. He finally was induced to make a confession. That confession was used to secure a verdict sending him to the electric chair.

"Our Constitution guarantees the assistance of counsel to a man on trial for his life in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law. Surely a Constitution which promises that much can vouchsafe no less to the same man under midnight inquisition in the squad room of a police station."

The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law. The Supreme Court held in the Scottsboro cases (Powell v. State of Alabama, supra) that the right to counsel in a capital case is embraced in the guarantee of due process of law. Connecticut early recognized a right to be heard by counsel in a criminal case and embodied the right in Article 1, § 9 of the Connecticut constitution. See note 287 U.S. at pages 63 and 64, 53 S.Ct. at page 62. The scope and meaning of the right have been developed in the cases, culminating in the Spano case. Commentators have long pointed out that advice of counsel, to be meaningful, must be obtained in the early stages of a criminal prosecution. Representation at

the trial can be of little help if a person has been led to describe his actions in terms which provide the elements of the most serious charge possible against him. When the investigation has progressed to the point of a formal charge of murder the defendant is in the greatest need of competent legal advice so that he may not knowingly throw away his constitutional rights and furnish tools to convict himself of crimes of which he may be innocent or of a degree greater than that of which he may in fact be guilty. The danger exists that this may have happened here. There was not here the long questioning and trickery which induced the confession in the Spano case, but there was a far greater need for counsel due to the age, mental limitations, and suggestibility of the accused.

■ The record here shows that the accused, Reid, was a colored youth, 19 years of age, whose education was not more than 8th grade, obtained in a county home and a reformatory, with an unsuccessful attempt to continue, first at public high school and then at a public junior high school. He was of dull normal mentality, on the borderline of mental deficiency. He was charged with a hammer murder in a parking lot in Hartford in an attempt to rob an older woman, a neighbor and friend of defendant's mother. He was then temporarily separated from his wife, and living with his mother. His mental health was questioned, but before trial two psychiatrists examined him and found him able to understand the proceedings against him and assist in his defense. He was picked up at his sister's residence in New Haven the night after the crime. He was questioned by New Haven police, then taken to Hartford and questioned by Hartford police, arriving at Hartford Police Headquarters about 1:10 a. m. He was in custody from his apprehension at 9 or 10 o'clock in the evening, until 1:15 the next morning, when he gave the Hartford police a story inculpating himself, but claiming that the actual killing was done by another, claimed to be named Green. He had been questioned earlier by New Haven police at the time of his apprehension and while waiting the arrival of Hartford police. The Hartford police, over a period of several hours following the oral confession, committed to writing a narrative version of his answers to their questions, which he signed between 3:30 and 4:00 o'clock and which was used in evidence against him on his trial. The police were at the time on round the clock duty in an effort to clear up a large number of then unsolved slayings, including six so-called "execution murders" in the course of holdups by Taborsky and Culombe, later referred to as the "Mad killers". Reid was arraigned in Hartford Police Court in the morning, charged with murder, and the hearing was continued. The police knew prior to arraignment that Reid was a minor. He was not represented by counsel and was never advised of his right to counsel. Later that morning the police questioned him further, telling him that they didn't believe him, and that he'd feel better if he told the whole truth. He gave another statement to police, after he had talked with his wife, who had been called to the station. The second statement, which admitted Green was fictitious, and that Reid had alone done the killing, was also used against him on the trial. Thereafter, Reid accompanied police over the route taken by him the afternoon and night of the killing, pointing out the sequence of his actions and later leading police to the place where he had disposed of the hammer head and the key of the victim's car. All this was used against him at the trial. He testified at the coroner's hearing February 6, 1957 after being advised of his right to say nothing, but not of his right to be represented by counsel at the inquest. The Police Court hearing was never reconvened. A Superior Court bench warrant on information by the State's Attorney issued on January 17, 1957, was served on Reid January 22, 1957 and a Grand Jury was called. At that point (the inquest by the Grand Jury) on

March 7, 1957 the Public Defender first talked with Reid. On April 5, 1957 the Public Defender was appointed as counsel and guardian ad litem of Reid.

The record of the trial reveals that the Assistant State's Attorney who tried Reid's case had come to the trial directly from presenting medical evidence in the case of Taborsky and Culombe, then on trial in another courtroom of the same courthouse.

The Connecticut Public Defender law (C.G.S.A. § 54–80) is constitutional, and timely appointment of competent counsel under it provides due process. See opinion of Court of Appeals in the instant case, 277 F.2d 702. Competent counsel were appointed in Reid's case. Their appointment, however, came at a stage of the proceedings too late for their representation and advice to inform Reid of the rights supposedly available to him when apprehended for a capital crime, in time to be of any value to him. In view of Crooker v. State of California, supra, this court held upon the original trial of this action that appointment of counsel at the time of the Grand Jury proceedings was a timely appointment. The full record casts doubt upon that holding. The confession that fully implicated Reid was obtained after he had been presented in Police Court on the murder charge and the case continued for a month, for further police investigation, without provision of counsel for Reid or any disclosure to him of his right to be represented by counsel.

Statements elicited during questioning are bound to be colored to some extent by the purpose of the questioner who inevitably leads the witness in the absence of court control. This coloring is compounded where the statement is not taken down stenographically, but written out as a narrative in language supplied by the questioner. Where the state of mind of the defendant is an issue in the case, as in determining the degree of a homicide, this wording of his account of the crime is of vital importance. The jury in Reid's case was charged that it could bring in a verdict of guilty of murder in the first degree, with or without recommendation of life imprisonment, murder in the second degree, manslaughter, or not guilty. With the confessions in evidence it brought in a verdict of guilt in the first degree, carrying a mandatory death sentence. Had counsel been available to Reid he might have advised Reid of the danger to one on trial for his life on charges such as were faced by Reid of adopting the language of another in a statement signed by him.

Reid appears to have been suggestible, as might be expected in view of his age, mentality and education. The officers did not deny that they had originally assumed that more than one man was involved, because of the size of the victim, and that the story about Green might have been elicited by their demands to know who was with Reid when the thing happened.

Having obtained the confessions, no great effort was made to check thoroughly through interrogation of other witnesses the details of Reid's movements and actions prior to the assault as he had described and reenacted them for the police, partly because of the unusual activity regarding other crimes at the time. The second confession as written by the officer and adopted by Reid included an admission that Reid planned on hitting someone to get money and that the victim came to his mind. This he repudiated at the trial, but the jury may well have credited it in arriving at the verdict which required the death penalty.

No objection was made at trial to the admission of the confessions in evidence, there being no claim of coercion. The sole question here is whether there is a failure of due process when such confessions are used at a trial, having been obtained while, it is claimed, defendant was deprived of his constitutional right to counsel. Is it a violation of the Fourteenth Amendment for a state court to allow the use in a capital case of confessions obtained by being "nice" to a minor and giving him candy bars while depriving him of the assistance of coun-

sel? At what point in the proceedings must counsel be provided? No hard and fast rule has as yet been laid down. It is plain, however, that in a capital case involving one of Reid's age, mentality and schooling, provision of counsel was necessary at least as soon as the formal accusation of murder was made in the Police Court. The use of statements elicited from him thereafter while kept in ignorance of his rights made the trial fundamentally unfair. The judgment of conviction must be set aside. It is so ordered.

### Findings of Fact

1. On the morning of January 16, 1957 the frozen body of Mrs. Florine McCluney was found in her car in a parking lot in Hartford.

2. She had suffered skull fractures and lacerations of the head.

3. A trail of blood was found leading from a spot about 100 feet away to the car.

4. About 8:30 p. m. Hartford police requested New Haven police to apprehend Benjamin Reid, a resident of Hartford.

5. New Haven police went to Reid's sister's residence at New Haven, found Reid there, and took him to New Haven police headquarters to await arrival of Hartford police.

6. Reid was colored, 19 years old, of dull normal mentality bordering on mental deficiency, with an eighth grade education, married to a woman some years his senior, from whom he was temporarily separated. He had been brought up largely in a county home and a reformatory. His twin brother and a sister were at the time inmates of mental institutions.

7. Hartford detectives brought Reid back to Hartford, arriving at headquarters about 1:10 a. m. January 17, 1957. The detectives were on round the clock duty at the time attempting to solve a number of killings in the Hartford area.

8. Reid was questioned by New Haven police while in their custody, and by Hartford police on his arrival there.

9. Hartford police told him anything he said could be used against him, but neither they nor anyone else told Reid of his right to have counsel.

10. On questioning, starting within 5 minutes of Reid's arrival at Hartford, he confessed to implication in the killing, although he blamed one Green for the actual hitting of the victim with a hammer.

11. Because of the size of the victim, and the distance from the point of attack to the place the body was found, the police believed that more than one man was implicated, and so suggested to Reid.

12. The statement was typed by an officer in narrative form, completed at 4:30 a. m., and signed by Reid.

13. Thereupon, Reid was booked for murder and locked in a cell, which was furnished with a cot.

14. About 9:00 a. m. January 17, 1957 Reid was presented in Hartford Police Court. The judge was informed that Reid was alleged to have committed a murder on the preceding day. The state asked a continuance for investigation, whereupon the Court continued the case until February 14, without bond.

15. No counsel was appointed or notified, and Reid was not informed of his right to counsel.

16. The police knew Reid was a minor, but did not inform the court. No guardian was then appointed.

17. Reid was not taken immediately to the jail, but was returned to the detective bureau for further questioning.

18. He cried for some 15 minutes, then on urging by police to tell the truth, he made an additional confession in which he eliminated Green. As taken down in narrative form by police, and signed by Reid, it admitted that he had planned to hit and rob someone, and had the victim in mind.

19. From 1:30 to 3:30 p. m. Reid accompanied detectives on a tour of his route on the day of the crime.

20. About 4:00 p. m. he was taken to the Health Department where a blood sample was taken from his arm.

21. He was taken to Hartford County Jail about 4:15 p. m.

22. Later the same day he was taken out to show the detectives where a hammer head and car key had been disposed of.

23. The hammer head and key were not found, but the next day Reid said that because the police had been nice to him (one of them had given him candy bars) he would show them where the articles were.

24. He was taken out the next day, January 18, and pointed out the place, where the police subsequently found the hammer head and key.

25. A Superior Court bench warrant issued January 17, 1957, on an information filed by the State's Attorney.

26. The warrant was served on Reid January 22, 1957.

27. Reid was presented at a coroner's inquest on February 6, 1957. He was told he had the right not to incriminate himself, but was not told of his right to counsel. He testified at length before the coroner.

28. On March 7, 1957, Reid was called before the Grand Jury. On that date for the first time Reid talked with an attorney, the Public Defender, James Cosgrove, Esq.

29. On April 1, 1957, petitioner, by letter addressed to Judge Shannon of the Superior Court, requesting that the Court appoint "Mr. Thomas McDunnugh" (sic) as counsel and further stating that he had contacted Mr. McDonough who had told him he would accept his case if the Court would appoint him.

30. On April 5, 1957, petitioner was brought before the Court where it was determined that he had no funds and was told that, under the Statute, it was the duty of the Public Defender to represent him. His request was denied. Attorney Cosgrove, Public Defender for Hartford County, was appointed to represent Reid, some two and one-half months after his arrest.

31. On April 27, 1957 Attorney William D. Graham was appointed Special Assistant Public Defender to represent Reid.

32. On May 17, 1957 Mr. Cosgrove moved to be discharged as counsel for Reid, stating that he could not get any cooperation from Reid. The request was denied.

33. Trial started June 20, 1957. Mr. Cosgrove carried on the examination and cross-examination of witnesses. Reid testified in his own behalf, the confessions to the police having been placed in evidence by the state, as well as the hammer head, the key and other physical evidence, and testimony as to Reid's guiding the officers on their tour of the area.

34. Reid was found guilty by the jury June 27, 1957 of murder in the first degree, without recommendation of life imprisonment, and was sentenced to death.

### Conclusions of Law

1. The court has jurisdiction of the parties and subject matter of the action.

2. It is the duty of the courts of the state, when a minor of limited intelligence, ignorant of his legal rights, is brought before them on a capital charge, to inform the accused of his right to counsel and to provide the assistance of counsel if the accused is unable to do so because of indigence.

3. Confessions obtained while an accused is deprived of such a right to counsel are inadmissible in the trial of a capital case, and their use a violation of the Fourteenth Amendment guarantee of due process of law.

4. Petitioner is entitled to judgment setting aside his conviction and providing for his release unless accorded a new trial within a reasonable time.