# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs July 8, 2014

## STATE OF TENNESSEE v. KENNETH KIRKWOOD

### Appeal from the Criminal Court for Shelby County
### No. 09-07493   Chris Craft, Judge

_____

### No.  W2013-01007-CCA-R3-CD  -  Filed August 27, 2014

_____

Appellant, Kenneth Kirkwood, was convicted by a Shelby County jury of especially aggravated robbery, especially aggravated kidnapping, use of a firearm in the commission of a dangerous felony, and aggravated burglary.  Following a sentencing hearing, the court imposed a total effective sentence of forty-five years, to be served at 100%.  Appellant filed a motion for new trial, which was denied.  He argues on appeal that the jury verdict was against the weight of the evidence, that counsel was ineffective, and that the trial court erred by not granting him a continuance on his motion for new trial.  After thoroughly reviewing the evidence, we affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R MCMULLEN, JJ., joined.

Paul K. Guibao (on appeal) and Larry E. Copeland (at trial), Memphis, Tennessee, for the appellant, Kenneth Kirkwood.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Marriane Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

*Factual Background*

The crime from which this appeal arose occurred on the morning of April 28, 2009. According to the testimony of the victim, Arnedra Taylor, she left her home in Memphis that morning to go to the Family Dollar store to pick up some household items. Her husband was at work, and her three children were at school. Ms. Taylor had a small business selling candy and snacks from her home to neighborhood children, and was locally known as "the candy lady." At about 11:00 a.m., Ms. Taylor returned from Family Dollar and was sitting in her parked car in her driveway. Her car door was open while she talked on her cell phone with her sister's boyfriend.

As she sat there, she noticed a gold Chevy Trailblazer SUV pull up in front of her house. A man she did not recognize at the time, but later identified as Appellant, stepped out of the vehicle and walked across her front yard. She described the man to the jury as "a darker skin male, low haircut, wavy hair, and he had on a black dicky short set." She also testified that he was about five feet and five or six inches in height and had a medium build. As the man approached the driver's door of Ms. Taylor's car, he yelled back to the driver in the Trailblazer, "I'm going to see if they still sell soft drinks." Ms. Taylor thought that strange, because the man could have purchased a soda at a nearby store, and she usually only sold her candy and drinks to children, not adults.

The man walked directly up to the car door and asked Ms. Taylor if she still sold drinks. She said she did, but didn't have any at the moment. The man then pulled a black handgun out of his waistband, pointed it at Ms. Taylor, and said "you already know what this is." He asked who was inside the house, and Ms. Taylor replied, "no one." Appellant then said, "let's go in the house." Ms. Taylor was still on her cell phone, and she was repeating what Appellant was saying to the person on the other end, hoping he would realize that she was in danger. But her sister's boyfriend never stopped talking and never realized that something was wrong.

Appellant grabbed Ms. Taylor's key ring, grabbed her arm, and ordered her into the house. He took the phone out of her hand, turned it off, and put it in his pocket. At that point, she noticed the driver of the Trailblazer stepping out of the vehicle. Appellant did not know which of the keys opened the front door, so he gave them back to Ms. Taylor, holding his gun to her back as she unlocked the door. Ms. Taylor's bulldog was sleeping on the couch when the door was opened. Appellant asked what the dog was going to do. Ms. Taylor told him that the dog wouldn't bother them if they didn't bother him, and she sent the dog to a back room for its own safety.

Once inside, Appellant kept asking for money, and Ms. Taylor told him she didn't have any. Then she thought about a jar in her bedroom where she kept her "candy lady" money and she told him about it. He walked her to the bedroom, his gun still in her back.

Following his orders, she retrieved the jar from the top shelf of her closet and placed it on a night stand. It contained about forty dollars in one dollar bills and "a lot of change." Appellant became agitated because of the small amount of money in the jar, and he said to Ms. Taylor, "oh bitch, you think I'm playing." She replied that if she had anything left to give they would have had it already so they could leave her home.

The driver of the Trailblazer was also in the house by that time. He was later charged as Appellant's co-defendant. Ms. Taylor described him as "kind of tall, lighter skin than the first male, big round hazel-colored eyes." He was wearing an oversize ball cap, dark color t-shirt and dark jeans. He carried a black automatic pistol in his left hand and his right hand was wrapped in a towel or t-shirt. Appellant nudged Ms. Taylor onto the bed and the two men walked around the bedroom, looking in drawers, on top of the dresser, and lifting the corners of the mattress. As they explored the bedroom, the second man kept reminding Appellant not to touch anything.

Ms. Taylor, who remained on the bed, then told the intruders to check a Planter's Peanut can on top of the television set in the bedroom "because sometimes my husband would keep a little money in there." The second man picked up the jar and carried it into the hallway. Ms. Taylor testified that her husband later told her that there had been about $200 in the can. Appellant kept insisting that he knew Ms. Taylor had more money, that she thought he was playing, and he said that he was going to shoot her in the face. He waved his gun in her face, and she pushed it aside, telling him that "I had three kids coming home from school in a couple of hours and they couldn't come home to find me shot over a few dollars."

This appeared to enrage Appellant, because he "cocked his gun back to get ready to shoot me but it jammed." Appellant tried to get the gun unjammed four or five times, but without success. He then said to the other intruder, "hey cuz, let me see yours." The two men switched guns. Appellant grabbed a decorative pillow from the bed, put it against Ms. Taylor's left hip and fired. The bullet entered Ms. Taylor's left hip, exited her left inner thigh, re-entered the right inner thigh and came out of the back of the right thigh. Ms. Taylor reported that the shot felt like fire, a painful and numbing tingling from the waist down. She subsequently suffered medical complications from the injury that left her disabled.

The men then left, taking the money with them. They also took Ms. Taylor's oldest son's laptop computer from the front room as they exited. After she heard the front door close, Ms. Taylor, bleeding heavily from her wounds, crawled across the bed to try to get to the bedroom window so she could get the tag number of the intruders' vehicle. But it was already gone by the time she reached the window. She then crawled to the living room to get her cordless phone, pulling herself by her arms, and she called 911.

A Fire Department EMT arrived shortly thereafter. He cut Ms. Taylor's jeans off, stopped the bleeding and began an IV line. When police officers arrived, Ms. Taylor told them what happened and described the two perpetrators. An ambulance followed, and transported the victim to the MED trauma center for further treatment. A crime scene officer from the Memphis Police Department arrived after the ambulance carrying the victim left. She took photos of the crime scene, some of which showed smears of blood on the blankets and the jeans, and drops of blood on the floor. She collected the evidence, including the bloody jeans and a bullet casing she found on the floor.

*Identifying the Suspects*

Sergeant Myron Fair of the Memphis Police Department's Robbery Division was assigned to the case. He went to Ms. Taylor's home on the afternoon of April 28 after she had been taken to the trauma center, and he observed the collection of evidence. He then went to the hospital. After checking with the doctor about Ms. Taylor's condition, he went into her room, introduced himself, and interviewed her. The interview was very brief because Ms. Taylor was in pain and very upset. She was nonetheless able to explain the basic details of the crime to the sergeant, including a description of the vehicle the perpetrators were driving. She did not, however, describe the perpetrators at that time.

Sergeant Fair gave Ms. Taylor his card and told her to call him when she was feeling better. When he returned to his office, the Sergeant conducted a record search to find out if there was any connection between a gold SUV and other robberies in the area, but the search did not turn up anything useful. He also sent out an e-mail broadcast to the precincts with a description of the crime and the SUV, so officers system-wide would be notified to look for the vehicle.

Ms. Taylor did not know the identity of either perpetrator. She was still recuperating several weeks after the incident, when a neighborhood friend visited. Ms. Taylor told the neighbor about the incident and said that although she had never seen the shooter before, she thought that the other individual looked familiar, someone whom she had seen around the neighborhood, but whose name she did not know.

After Ms. Taylor described that individual's hazel eyes, the neighbor pulled up her niece's "My Space" page. The two women started going through the pictures and found several pictures of a young man with the neighbor's niece. Ms. Taylor recognized him as the second intruder by his hazel eyes. Ms. Taylor left the pictures on the computer and showed them to her husband when he came home. He identified the man in the picture as "Ms. Joanne's son." Ms. Joanne was a neighbor who used to work for a man who had rented a house to Ms. Taylor and her family. Ms. Joanne's son was named William Acey.

Ms. Taylor informed Sergeant Fair of this development, and he called her in for a photographic line-up on May 23, 2009. According to the testimony of both Ms. Taylor and Sergeant Fair, she was shown a line-up sheet with the faces of six individuals, and was told that the man she named might or might not be in the line up and to take her time while looking at the sheet. Within a minute she picked out the photo of William Acey. She circled the photo and wrote on the sheet, "[t]his is one of the guys who approached me in my driveway forced me in my home at gunpoint took me to my bedroom demanded money and gave his gun to his partner to shoot me in my left thigh." (no punctuation in original). After she identified Mr. Acey, Ms. Taylor prepared a written statement detailing the circumstances of the crime in the same terms as her explanation at the hospital, but adding a general physical description of the two perpetrators that included their height, weight, complexions, and what they were wearing.[1] Shortly thereafter, Mr. Acey was arrested and jailed.

The record shows that Ms. Taylor and Sergeant Fair followed up on several other leads that did not pan out. On May 7, 2009, even before she identified William Acey, Ms. Taylor gave the Sergeant the names of two men, Marcus and Tyrone Fields, that someone told her were responsible for the crime. Sergeant Fair researched the names. He discovered that Marcus Fields was incarcerated at the time of the crime, therefore eliminating him as a suspect, and he was unable to discover anything about Tyrone Fields. On June 12, 2009, Sergeant Fair received a tip from Crime Stoppers that a man named Rico Smith might have been one of the perpetrators.[2] He took a photo of Mr. Smith, put it in a photo lineup and had Ms. Taylor come in to view it. Ms. Taylor was unable to identify anyone in that lineup.

On August 3, 2009, Sergeant Fair received a Crime Stoppers tip that a man named Kenneth Kirkwood who was in jail had been bragging about robbing and shooting people. The sergeant created another photo lineup that included Appellant's picture. On August 11, Ms. Taylor was brought in and was given the same instructions as in the two previous lineups. She identified Appellant in about a minute, and she wrote on the lineup sheet, "[t]his is the other guy who robbed me. He put the pillow to my left hip and shot me." Ms. Taylor subsequently attended two preliminary hearings at which she identified both Appellant and Mr. Acey. On November 19, 2009, the Shelby County Grand Jury indicted Appellant for especially aggravated robbery, especially aggravated kidnapping, employment of a firearm during the commission of a dangerous felony, and aggravated burglary. Mr. Acey was

---

[1]Although there was testimony at trial about Ms. Taylor's written statement, it was not admitted into evidence.

[2]Ms. Taylor testified that she was informed that Sergeant Fair finished his shift at 4:00 p.m. and that if she acquired any relevant information after that time, she should phone it in to Crime Stoppers. Her testimony shows that she was the source of all the Crime Stoppers tips cited in this opinion.

indicted on similar charges.[3]

*The Criminal Trial*

Prior to trial, the State filed a notice of intent to seek enhanced punishment of Appellant pursuant to Tennessee Code Annotated Section 40-35-202. The State cited Appellant's previous convictions for especially aggravated kidnaping, aggravated robbery, and possession of a controlled substance, and asked that Appellant be tried as a multiple offender, a persistent offender or a career offender. For his part, Appellant filed a motion to suppress Ms. Taylor's out-of-court identification, alleging that the photo lineup process was unduly suggestive and that it gave rise to "a very substantial likelihood of irreparable misidentification." *See Simmons v. United States*, 390 U.S. 377, 384 (1968). The appellate record is devoid of any order related to the motion to suppress, and Appellant did not bring up the motion during trial.

Appellant and Mr. Acey were tried together over a period of one week, from December 10 to December14, 2012. Ms. Taylor testified that about ten minutes passed from the time she was accosted at her car by Appellant until she was shot, and that she had ample opportunity to get a good look at the perpetrators during that time. She stated that when Appellant was threatening her with his gun in her bedroom, he and his co-defendant stood only a foot and a half away from her, and she could see their faces clearly in the light from the bedroom window.

She further testified that she gave the police officers who arrived on the scene a description of both defendants in which she mentioned that the shorter, stockier man had an underbite and a scar on his face. She was asked on cross-examination to point out the scar on Appellant's photo in the line-up sheet, and she used a laser pointer to indicate an almost imperceptible difference in color between an area under Appellant's left eye and the surrounding flesh of his cheek.

The 911 supervisor for the Memphis Police Department, the EMTs who had treated Ms. Taylor at the crime scene, and the crime scene officer who collected the evidence testified briefly. The prosecution then called Sergeant Fair. He testified that he did not give Ms. Taylor any hints about who to pick out from the photo lineups and that he told her that the individuals she named might or might not be included. He also stated that Ms. Taylor picked the suspects out from the two lineups in less than a minute, and that he did not tell her what

---

[3]Appellant was charged in the indictment with unlawful employment of a firearm during the commission of the other felonies, while Mr. Acey was charged with unlawful possession of a firearm with intent to go armed during the commission of those same felonies. In all other respects, the charges against the two men were the same.

to write on the sheet. The lineup sheets that Ms. Taylor viewed were admitted into evidence.

At the conclusion of the prosecution's case, Appellant and Mr. Acey were each informed that they had the constitutional right to testify on their own behalf or to decline to testify, and that if they waived that right, the jury would be instructed that it was not permitted to draw any inferences from that decision. *See Momon v. State*, 18 S.W.3d 152, 162 (Tenn. 1999). Appellant declared that he wished to waive his right to testify.[4] Mr. Acey chose to testify on his own behalf, however. When he took the stand, he denied that he robbed and shot Ms. Taylor. He testified that he lived with his mother, two or three blocks away from Ms. Taylor's house. He said he didn't really know her, but he knew "of" her since he was a child, because her children sometimes came over to his mother's house to play basketball. He denied that he knew Appellant or had any dealings with him prior to April 29, 2009, but he admitted that he had seen Appellant around the neighborhood a few times.

The court gave the jury its instructions, including explanations of all the lesser included offenses that might apply to the charges in the indictment, and the parties presented closing arguments. The jury then deliberated for about two hours before finding Appellant guilty of especially aggravated robbery, especially aggravated kidnapping, use of a firearm in the commission of a felony, and aggravated burglary. Mr. Acey was acquitted of all charges.

Appellant's sentencing hearing was conducted on February 22, 2013. The trial court cited several enhancement factors and the absence of any mitigating factors in sentencing Appellant as a Range II offender to thirty-five years for especially aggravated kidnapping, thirty-five years for especially aggravated robbery, ten years for employing a firearm during the commission of a felony, and nine years for aggravated burglary. The court ordered that the kidnapping, robbery, and burglary sentences be served concurrently to each other, and that the firearms sentence be served consecutively to the other sentences, for a total effective sentence of forty-five years, to be served at 100%.

On March 22, 2013, Appellant filed a timely motion for new trial, arguing that the "verdict was contrary to the law and the evidence in this case." Another ground for new trial was stated as follows: "[d]efense counsel at certain times fell asleep during the presentation of this case, this ground is placed at the defendant's request and only to protect the defendant's appellate rights." The trial court conducted a hearing on the same day, and explained to Appellant that the allegation amounted to a claim of ineffective assistance of counsel, and that if it was raised and denied on a motion for new trial, Appellant might be unable to raise that ground in a post-conviction proceeding. The court accordingly advised

---

[4]Appellant was informed that if he did testify, the State intended to cross-examine him about his prior felony convictions.

Appellant against proceeding on that ground.

Appellant said that his attorney had not come to see him since he was sentenced, and he asked the court to grant him a continuance so he could confer with his attorney before deciding whether to proceed on the ineffective assistance claim, but the court denied the request. Appellant then said he wanted to go forward on that claim and the court ruled. The court stated that it had approved the verdict as thirteenth juror, and that it was not contrary to the law or the evidence. On the claim of ineffective assistance of counsel, the court explained that Appellant's attorney told him at the start of the trial that he was on cold medication that sometimes made him drowsy. The court continued:

> I particularly watched him during the trial along with his codefendant and his codefendant's attorney and at no time from what I can see was [Appellant's attorney] not ready. At no time was he sound asleep. At no time was he trying to fall asleep, head hit the counsel table. And every time it was time for cross-examination of a witness [Appellant's attorney] got up and performed adequately. And I find that he was not asleep during the presentation of this case affecting the defendant's rights to a fair trial. I find Mr. Kirkwood had a fair trial.

The court accordingly denied Appellant's motion for new trial. This appeal followed.

*Analysis*

*1. The Sufficiency of the Evidence*

A verdict of guilt, rendered by a jury and approved by the trial judge, "accredits the testimony of the State's witnesses and resolves all conflicts in the testimony in favor of the State." *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally entitled to a presumption of innocence, the verdict of guilty removes this presumption and replaces it with one of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.*

The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. Tenn. R.App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). In making this determination, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*,

639 S.W.2d at 914. Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 599, 561 (Tenn.1990).

In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused. *State v. Dyle*, 899 S.W.2d 607, 612 (Tenn. 1995); *see also State v. Demarco Bowdery*, No. 02-C01-9705-00173, 1998 WL 30724 (Tenn. Crim. App., at Jackson, Jan. 29, 1998), *perm. app. denied* (Tenn., Oct. 12, 1998). "The identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of all competent proof." *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)).

Appellant argues that the verdict in this case was based on insufficient evidence. He notes the lack of investigatory effort by Sergeant Fair and complains that "the victim through her own independent 'investigation' seems to be in charge of the detective's case." Appellant notes that Ms. Taylor was the only witness linking him to the commission of the crime, and he suggests that her identifications are suspect because the only information she obtained about Appellant came from an undisclosed individual in the Shelby County Jail, and she did not always mention the same details about his appearance in every description of him that she gave.

It is well established, however, that, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing *Strickland*, 885 S.W.2d at 87-88). If that were not so, it would be extremely difficult to obtain convictions for crimes involving only one victim when those crimes are committed out of the public eye.

Ms. Taylor testified that she was able to get a good look at Appellant on the morning of the crime, and that he stood only a foot and a half away from her as he threatened her with a gun. She further testified that the light from her bedroom window was bright enough to enable her to see his face clearly. Because she did not recall ever having seen Appellant prior to the crime, Ms. Taylor had to rely on information from neighbors and friends about the names of possible suspects to pass on to the police. Ms. Taylor picked Appellant's photo from a lineup of six similar faces within about a minute of seeing the lineup. She also identified Appellant at a preliminary hearing and at trial.

The general descriptions of Appellant that Ms. Taylor gave to police and other witnesses as to his height, build and complexion were consistent throughout the case, but, as Appellant points out, some of those descriptions mentioned a scar and an under bite, while others did not. However, inconsistency, inaccuracy and omissions in the description of a defendant by a witness who is otherwise able to positively identify the defendant are questions for the jury to consider in determining the weight to be given the testimony. *Radley*, 29 S.W.3d at 537; *see also State v. Spencer*, No. W2013-00657-CCA-R3-CD, 2014 WL 1767109 (Tenn. Crim. App., at Jackson, Apr. 29, 2014). The evidence in this case is more than sufficient to support the jury's verdict.

## II. The Motion for New Trial

Appellant also appeals the trial court's dismissal of his motion for new trial. He acknowledges that his attorney's performance at trial "fell within the range of competence demanded of attorneys in criminal cases," but his arguments are also directed towards the role of his attorney at the hearing on the motion for new trial.

We note that in order to obtain relief for ineffective assistance of counsel, a defendant must show not only that his attorney fell below the standards of the profession, but also that the attorney's conduct caused him actual prejudice. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984); *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Prejudice occurs when the defendant can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Goad*, 938 S.W.2d at 370. "Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997).

Defendants are entitled to the assistance of counsel at every critical stage of a criminal prosecution. *United States v. Wade*, 388 U.S. 218 (1967); *State v. Carruthers*, 35 S.W.3d 516, 567 (Tenn. 2000) (citing *United States v. Gagnon*, 470 U.S. 522, 526 (1985)); *State v. Kilby*, 763 S.W.2d 389, 390 (Tenn. Crim. App. 1988) (citing *Coleman v. Alabama*, 399 U.S. 1 (1970)); *State v. Mosher*, 755 S.W.2d 464, 468 (Tenn. Crim. App. 1988). Those stages include proceedings at a motion for new trial. *See Wallace v. State*, 121 S.W.3d 652, 659 (Tenn. 2003); *Abdi v. State*, No. M2012-02688-CCA-R3-PC, 2013 WL 6081461, at *8 (Tenn. Crim. App., at Nashville, Nov. 18, 2013). Assistance of counsel not only means the presence of an attorney at such proceedings, but also that counsel be effective. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995) (citing *Evitts v. Lucey*, 469 U.S. 387 (1985)).

Appellant complains that the same attorney that had represented him at trial also

represented him at the motion hearing, thereby creating an irreconcilable conflict of interest that prevented the attorney from vigorously pursuing a claim that his own performance at trial had been ineffective. Appellant suggests that the trial court could have cured this problem by appointing different counsel to argue the motion for new trial. While that clearly would have been the better practice, such a conflict does not, in and of itself, establish that counsel was ineffective, so as to entitle the defendant to relief. *See Porterfield v. State*, 897 S.W.2d 672, 679 (Tenn. 1995) (holding that although both the defendant's trial and appellate counsel were members of the Public Defender's Office, and his appellate counsel knew of his dissatisfaction with his trial counsel's presentation, the defendant failed to demonstrate any conflict of interest or show any prejudice); *Bourne v. State*, No. E2003-00462-CCA-R3-PC, 2004 WL 533938, at *8 (Tenn. Crim. App., at Knoxville, Mar. 18, 2004) *perm. app. denied* (Tenn., Sept. 7, 2004) (holding that the defendant failed to prove any prejudice arising his representation by the same attorney at his motion for new trial as had represented him at trial, even though he claimed that the attorney had been ineffective at trial).

Appellant nonetheless contends that the hearing on his motion for new trial fell so short of required constitutional standards as to require reversal or remand. To support this theory, he relies on the case of *United States v. Cronic*, 466 U.S. 648 (1984), which he refers to as "the companion case to the bellwether ineffectiveness-assistance case, *Strickland v. Washington.*" In *Cronic*, the Court noted the possible existence of "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified," and thus that prejudice can be presumed under those circumstances. *Cronic,* 466 U.S. at 658.

The *Cronic* Court stated that most obvious circumstance likely to prejudice the accused and thus to justify a presumption of prejudice is, of course, the complete denial of counsel. *Cronic,* 466 U.S. at 659. Our Supreme Court applied the same principle in *Wallace v. State*, 121 S.W.3d 652, 658 (Tenn. 2003) (holding that the attorney's failure to file a motion for new trial coupled with his failure to withdraw as counsel, thereby preventing the defendant from filing a pro se motion, was presumptively prejudicial). Another type of situation that would justify the presumption of prejudice would be one in which the surrounding circumstances make "the likelihood that counsel could have performed as an effective adversary . . . so remote as to have made the trial inherently unfair." *Cronic* at 660-61 (citing the Supreme Court's opinion in the infamous "Scottsboro boys" trial, *Powell v. Alabama*, 287 U.S. 45 (1932)).

It is noteworthy that after citing these and other examples, the Court determined that defendant Cronic was not entitled to the benefit of the exception to the rule of *Strickland v. Washington*, even though it was undisputed that his attorney had never tried a criminal case before, that he was appointed only 25 days before the very complicated criminal trial began, and that the trial resulted in a lengthy prison term for the defendant. *See also Bell v. Cone*, 535

-11-

U.S. 685, 697 (2002) (holding that an attorney's failure to represent his client effectively must be "complete" before the *Cronic* presumption of prejudice comes into play). The attorney in the present case filed a timely motion for new trial and included, at Appellant's direction, a claim of ineffective assistance of counsel. Thus, any failure by the attorney to effectively represent Appellant can not be characterized as "complete," and Appellant therefore is not entitled to a presumption of prejudice, but must prove that he was prejudiced by his counsel's actions in order to prevail.

However, Appellant does not directly address the question of prejudice. Instead, he complains about the trial court's refusal to grant him a continuance so that he could confer with his attorney about the legal consequences of pursuing an "ineffective assistance of counsel" argument in the proceeding at hand. The decision of a trial court to grant or deny a continuance is generally considered to be within the court's discretion, and will not be reversed on appeal absent a clear showing of abuse of that discretion. *Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966); *Mallard v. Tompkins*, 44 S.W.3d 73, 78 (Tenn. Ct. App. 2000); *State v. Burrus*, 693 S.W.2d 926, 929-30 (Tenn. Crim. App. 1985). In order to establish an abuse of discretion under the circumstances, a defendant must show that the denial of the requested continuance "denied the defendant a fair trial or that the result of the trial would have been different." *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (citing *State v. Mann*, 959 S.W.2d 503, 524 (Tenn. 1997)).

Appellant stated that he had not seen his attorney since he was sentenced, and he contends that he was deprived of his right to counsel as a result. It appears, however, that Appellant must have communicated with his attorney in some way, for the motion itself, prepared and submitted by the trial attorney, states in regard to Appellant's allegation about his falling asleep during trial "this ground is placed at the defendant's request and only to protect the defendant's appellate rights." The attorney did present Appellant's claim to the trial court, and the court considered the claim and ruled on it based on the court's own observations. It is unlikely that the court's ruling would have been any different if a continuance had been granted. Therefore, the trial court did not abuse its discretion in declining to grant appellant's motion for a continuance. Nor has Appellant shown any prejudice in the trial attorney's performance at the new trial hearing.

*CONCLUSION*

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JERRY L. SMITH, JUDGE